552 So.2d 627 (1989)
NATIONAL UNION FIRE INSURANCE COMPANY OF PENNSYLVANIA, Appellee,
v.
Kenneth W. SPILLARS, Johnny Hodge dba Hodge Auto Supply and Crow-Burlingame Company, Appellants.
No. 20,752-CA.
Court of Appeal of Louisiana, Second Circuit.
November 6, 1989.
Writs Denied January 12, 1990.
*628 Theus, Grisham, Davis & Leigh by David H. Nelson and Brian Crawford, Monroe, for appellee/Nat. Union Fire Ins. Co.
Davenport, Files & Kelly by Thomas W. Davenport, Jr., Monroe, for appellant/Kenneth W. Spillars.
Barnes, Jefferson, Robertson & Green by Stephen A. Jefferson, Monroe, for appellant/Johnny Hodge.
Shotwell, Brown & Sperry by Marshall T. Napper, Monroe, for appellee/Crow-Burlingame Co.
Before HALL, MARVIN and NORRIS, JJ.
NORRIS, Judge.
This is a suit by an insurance company to recover from the alleged tortfeasors the proceeds it paid on a policy against embezzlement. The insured, Wickes Co. d/b/a Howard Brothers Discount ("Howard"), absorbed *629 the first $50,000 of the loss and assigned its rights to the plaintiff, National Union Fire Ins. Co., who sued for the entire loss, $98,841.57. The trial court overruled exceptions of prescription and rendered judgment against two defendants, Kenneth Spillers (misspelled as Spillars in the caption; hereinafter "Spillers") and Johnny Hodge d/b/a Hodge Auto Supply ("Hodge") for $67,397.28. The court dismissed claims against a third defendant, Crow-Burlingame Co. After Hodge's motion for a new trial was denied, Hodge and Spillers separately took devolutive appeals, urging the trial court erred in finding:
(1) Prescription did not bar the suit;
(2) Spillers committed fraud;
(3) Hodge was a civil coconspirator with Spillers; and
(4) Quantum.
For the reasons expressed, we affirm.

Facts
Spillers was shop foreman at the Howard Distribution Center in Monroe from 1981 to 1986. He was in charge of maintaining their fleet of tractor-trailer rigs and had complete authority to buy parts and labor on Howard's account.
According to the company's Director of Loss Prevention, Mr. Barry Nichols, Howard received an anonymous phone tip in November 1984. Nichols notified the Associate Director, Mr. Ray Hughes, and began reviewing all of Howard's "paid invoice register" records. After about a month Nichols noticed a large number of invoices from Johnny Hodge. This was odd, as Hodge specialized in 4-wheel drive vehicles; Howard's fleet did not have any 4-wheel drives. Nichols telephoned Hodge, who verified he serviced 4-wheel drives. Nichols also apoke with Mr. Talmadge Simpson of Crow-Burlingame, whose invoices also seemed unusual. Nichols began to entertain doubts that parts listed on many of Hodge's and Crow-Burlingame's invoices were actually being delivered to Howard.
On February 18, 1985 Nichols met with Dep. Gary Brooks of the Ouachita Parish Sheriff's Office, saying he had questions about possible illegal activity. Dep. Brooks could not interpret the invoices; he testified that Nichols suspected Spillers of paying fraudulent invoices because Spillers "was the most logical person." In order to clear things up, Dep. Brooks subpoenaed Hodge's records on February 25 and interviewed him the next day. One paper in Dep. Brooks's file listed the date of the interview as February 20 but he was certain this was a typographical error. After their meeting, Dep. Brooks consulted the D.A. and offered Hodge immunity from prosecution if he would give a statement. Hodge did so on February 26, admitting in general terms a conspiracy to misappropriate Howard funds. Hodge eventually identified about 40 invoices for which no parts had been sent to Howard but Howard remitted payment. Hodge applied these monies to Spillers's personal account. Dep. Brooks felt that with receipt of Hodge's statement there was enough evidence to prosecute.
Immediately after obtaining Hodge's statement on February 26, Nichols and Hughes went to the Distribution Center, picked up Spillers and brought him to the Home Office. There they questioned him most of the day. By day's end, Spillers had signed two statements in which he admitted having an agreement with Hodge to sell Howard rearends he had rebuilt at his shop, and that most rearend charges billed to Howard were not legitimate. Nichols and Hughes clearly understood this to mean that invoices were submitted and paid, but no parts delivered. The statements are both dated February 26, 1985, and set the amount of taking at $75,000 and $103,000 respectively. After giving these statements, Spillers was arrested on charges of theft. After Dep. Brooks took him into custody and Mirandized him, Spillers voluntarily remarked that he was "involved with Hodge" to get fraudulent benefits worth about $125,000 from Howard. Spillers then asked for a lawyer.
National Union filed the instant suit on February 24, 1986. At trial National Union showed that Spillers was an avid 4-wheel drive mud-truck racer. He always went to *630 Hodge for maintenance and repair of his personal racing truck and Broncos; the racing truck carried a Howard Brothers logo. During racing season his bills with Hodge could total several thousand dollars a month. He would periodically telephone Hodge and tell him to invoice Howard for a rebuilt 18-wheeler part, usually a front or rear rearend. Hodge would send the invoice to Howard, where Spillers, as foreman, would approve it and send it to accounts payable. When Hodge received the check from Howard, he would apply the money to Spillers's account. Spillers's trucks represented the majority of Hodge's business during this time.
In his defense, Spillers testified he was pressured or coerced into giving the statements. We will discuss his testimony in greater depth later, but in essence he admitted that Hodge did not supply all the rearend parts for which he submitted bills, at Spillers's request, to Howard. He asserted, however, that he himself was rebuilding the parts at his own shop and selling them to Howard at a fair price; he used Hodge as a middleman only to avoid a company policy against buying from its own employees. For this reason the situation might look like fraud, but it was not.
Hodge's testimony was evasive but he ultimately admitted he had not supplied many parts for which he billed Howard. He was also unaware whether Spillers or anyone else was actually supplying them. Rather, he assumed that Howard was "sponsoring" Spillers's mud racing activities, and that the cost of repairs to the truck and Broncos was something "given to him." Hodge admitted that the majority of his work was derived from Spillers's trucks.
In written reasons for judgment the trial court found National Union had established by a preponderance of evidence that Spillers and Hodge engaged in a scheme to charge Howard for parts that were not delivered. It then considered and rejected their explanations as incredible and rendered judgment for the total of the fictitious invoices identified by Hodge.

Discussion: Prescription
By their first assignments, Spillers and Hodge claim the trial court erred in overruling the exceptions of prescription. They contend the action had prescribed before suit was filed on February 24, 1986.
The suit is based on misappropriation or wrongful taking. It is therefore a delictual action and subject to liberative prescription of one year. LSA-C.C. art. 3492. Ordinarily prescription begins to run on the day the injury or damage is sustained. From the face of the instant petition it was not apparent that prescription had tolled the plaintiff's action; thus the burden was on the exceptor to prove facts that would establish liberative prescription. Percy v. State, through E.A. Conway Hosp., 478 So.2d 570 (La.App. 2d Cir.1985); Cart v. Ducote, 490 So.2d 731 (La.App. 3d Cir. 1986), writ granted 494 So.2d 1164 (La. 1986). Spillers and Hodge contend the tortious acts occurred, and the plaintiff discovered it, over a year before suit was filed. The jurisprudence recognizes the doctrine of contra non valentem, whereby prescription does not begin to run on a cause of action that was not known or reasonably knowable to the plaintiff. Corsey v. State, Dept. of Corr., 375 So.2d 1319 (La.1979). Constructive knowledge sufficient to start the running of prescription requires more than mere apprehension that something might be wrong. Cardova v. Hartford Acc. & Indem. Co., 387 So.2d 574 (La. 1980). Prescription does not run against a person who is ignorant of the facts upon which his cause of action is based, as long as such ignorance is not wilful, negligent or unreasonable. Griffin v. Kinberger, 507 So.2d 821 (La.1987). Prescription does not run if the cause of action has not established itself with sufficient certainty to be susceptible of proof in a court of justice, or if the defendant has concealed information or misled and lulled the plaintiff into inaction. Brown v. State, through Dept. of Corr., 354 So.2d 633 (La.App. 1st Cir.1978).
The evidence is assembled both from the hearing on the exception and from the trial. After receiving an anonymous phone tip (the contents of which were not adduced at *631 trial) in Santa Monica, California in November 1984, Nichols immediately began investigating, first by methodically sifting through invoices and company records. Meanwhile Hughes was assigned to "watch Spillers's movements." Nichols began to suspect Spillers because he was the foreman. Spillers's counsel cites Nichols's comment on cross-examination at trial that he was "satisfied" by December 1984 that Howard "was suffering a loss at the hands of Spillers." R.p. 227. These words, however, are actually those of Spillers's counsel and affirmed by Nichols in response to a series of leading questions; they are out-of-step with the rest of his testimony, which was much more reluctant to accuse Spillers until the revelations of February 26. See, e.g., R.p.p. 253-254. Despite his alleged "satisfaction" with his suspicions, he continued his investigation and did not go to law enforcement until February 18. Hughes corroborated that by this time he had no more than an "idea" of Spillers's involvement. Hearing on Exception, 37. On February 26, 1985 Nichols met with Dep. Brooks and gave him copies of suspicious invoices; Dep. Brooks declared these meant "nothing" to him. Id., 6. Only after the Sheriff's Office became involved did the investigation question Hodge and Simpson directly about the matter. All witnesses corroborated that there was no factual evidence on which to proceed until Hodge gave his statement on February 26.
At trial Spillers called Mrs. Barnett, the fleet secretary at Howard while he was foreman. She testified that Spillers was controlling the entries in Howard's records and that if parts were being invoiced but not actually delivered, this fact could not be determined by a simple inspection of the books. R.p. 332. Spillers's acts, throughout the investigation, were steeped with fraud to the extent that he was successful in concealing his tortious activity. Under the circumstances, these acts blocked discovery of the scheme. Howard personnel had no way of knowing which, if any, of the invoices were fraudulent until Hodge told them so.
Moreover, until it received Hodge's statement Howard was without probable cause to initiate proceedings. A civil or criminal proceeding initiated without probable cause could expose Howard to liability for malicious prosecution if the suspects are ultimately cleared. Hibernia Nat'l Bank of N.O. v. Bolleter, 390 So.2d 842 (La.1980); Robinson v. Goudchaux's, 307 So.2d 287 (La.1975). Until February 26, Howard also suspected a Mr. Brock, but no action was taken against him as a result of the interviews and statements of that date.
The trial court found, and these findings are not plainly wrong, that the plaintiff discovered facts sufficient to entitle it to bring suit only on February 26, 1985, after questioning Hodge and Spillers and receiving their statements. Prior to this time, plaintiff had mere suspicions. The attempt to uncover hard facts was frustrated and foiled by Spillers's fraud, so the failure to uncover these facts was not wilful or negligent on the plaintiff's part but was rather a direct result of fraud and concealment on Spillers's part. The instant action, filed February 24, 1986, was timely.

Liability of Spillers
By his second assignment Spillers claims the trial court erred in finding the plaintiff proved its right to recover from him. The plaintiff must prove its case by a preponderance of evidence. Prestenbach v. Sentry Ins. Co., 340 So.2d 1331 (La. 1977).
National Union introduced certified copies of Spillers's written statements as Exhibits P-2A and P-4A. These admitted a fraudulent scheme with Hodge. Spillers conceded he wrote the statements, though under duress, admitting that most of the rearend bills were not legitimate. Hodge testified that he sent invoices, at Spillers's request, for parts he did not deliver, and he accepted payment. He identified the fraudulent invoices. Nichols, Hughes and Dep. Brooks testified, in essence, that Spillers's statements confirmed their earlier suspicions of his fraud; these witnesses also corroborated that Spillers made the statements. The trial court was entitled to find, from this evidence, that Spillers more likely than not engaged in the alleged activities.
*632 Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
At trial and on appeal Spillers has defended on two fronts. First he claims the statements cannot really be believed; if they are disallowed, the plaintiff's case no longer proves fraud by a preponderance. Second he claims his evidence proves, and the plaintiff's evidence does not refute, that he actually supplied, by means of a core exchange business, every part invoiced to Howard, and at a fair price; hence the company did not sustain any loss, and his only transgression was in circumventing an internal company policy.
Validity of statements. Spillers was taken to a small room and questioned almost the entire day of February 26 by Nichols and Hughes. He was not under arrest. According to Spillers, he wrote out the statements exactly as dictated to him, though he neither knew nor trusted Nichols. He claims not to know what the word "legitimate" means, and to have thought he was admitting only a violation of company policy; he denied admitting embezzlement, theft or fraud. He denies any post-arrest remark to Dep. Brooks.
The trial court had no qualms about rejecting this testimony. Spillers did not appear so naive that he could be coerced into making the admissions contained in the statements. The court noted the various misspelled words, including the word intended as "legitimate." The court stated:
Any man, particularly a man with an eleventh grade education and the experience and business acumen of Mr. Spillers, would know that he was admitting to wrongdoing and the taking or theft of $75,000.00 to $103,000.00 from Howard's. The statements also refer to the taking of $3,000.00 in tools and "kickbacks" of approximately $25,000.00. To this court, there is no misconception or misunderstanding of these terms and meanings. In both statements, Mr. Spillers gave an approximate total ($75,000.00 and $103,000.00) of the amount obtained from Howard's and, in the second statement, he broke it down into an approximate amount for each of the years from 1981 to 1985. Mr. Spillers's explanation concerning his understanding of these statements and his insistence that he was only writing what Mr. Nichols told him to write are simply not believed by this Court. R.p. 84.
The court also noted that according to Nichols, Spillers began the interview by coolly denying everything, but when confronted with the detailed invoices just identified by Hodge as fraudulent, Spillers gradually admitted his wrongdoing, and finally reviewed and marked the fraudulent invoices. This pattern of denial, admission and cooperation supports the finding that the statements are truthful. The statements were followed by an unsolicited remark to Dep. Brooks. The trial court's conclusions are firmly grounded on a credibility call resolved against Spillers and we see no basis for disturbing it. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, supra.
The core exchanges. Spillers testified that in each instance of a suspicious invoice, he was personally supplying Howard with a rearend part that he had refurbished on his own premises and his own time. He said that usually the process consisted only of replacing seals and bearings, which could be done in one night's time. He then billed Howard through Hodge because company policy prohibited Howard from buying from its own employee. At argument counsel vigorously argued that this business was possible by "core exchanges," which are common in the industry. These are credits for trading in parts to be rebuilt. The mechanic need begin with only one good "core"; when he receives a part for rebuilding, he actually substitutes the good "core" for the old one, which he later rebuilds and saves to install in the next part that needs rebuilding. Spillers claims Howard always received a good, rebuilt part; that the core was always returned; and that the price was competitive. Moreover, he adds, there was no direct testimony by any Howard's employee that parts were not delivered.
We do not believe the trial court misunderstood the concept of "core exchanges." *633 Rather, the court found Spillers was attempting to extend his core exchange business to the transactions clearly identified by him as "not legitimate" and by Hodge as fraudulent. Had Spillers stated on February 26 that all the invoices represented rearends he rebuilt, then his trial testimony would have been more credible. Cf. State v. Byars, 550 So.2d 876 (La.App. 2d Cir. 1989). The trial court's particular doubts are outlined at R.p. 85-87. For instance, can such massive parts (front rearends weigh from 750 to 1,000 lbs. and rear rearends about 350 lbs.) be so effortlessly spirited from Monroe to Calhoun and back in one night, even with the proper machinery to load and unload them on each end? And on successive nights? The court felt this "defied human expectation and logic." Would Spillers keep no records of his purchases of rings, bearings and other parts necessary for this personal enterprise? The court found this inculpatory. And why did Mrs. Barnett testify that Howard never used rebuilt parts, when Spillers claims to have bought them so frequently? In sum, we do not detect manifest error in the trial court's refusal to find that Spillers was simply running a rearend core exchange, contrary to Howard's internal policy, in favor of the finding that Spillers was billing Howard for parts never delivered.
Spillers finally contends Howard presented no concrete proof that the parts were never delivered. He refers to the separate file maintained for each truck; it should show whenever a rearend is replaced; by examining this and inspecting the truck, someone could have determined and testified whether any trucks lacked the new parts their files reflected. This argument has a certain appeal, but it strikes us as the defendant's burden to adduce such evidence once the plaintiff has made its case by the confessions of the parties involved. Spillers and Hodge could have subpoenaed these records and shown that some or most of the invoiced parts actually found their way into Howard's trucks. They did not do so. Moreover, Mrs. Barnett cast serious doubt on the reliability of these files, as noted by the trial court.
Spillers finally cites the testimony of his witness, Steve Elliott, a forklift mechanic who worked under Spillers at the Distribution Center. Elliott recalled one occasion of picking up a rearend from Hodge, as well as one occasion of picking up a part from Spillers's shop. He testified, however, that most of his time was spent in the forklift shop. R.p. 309. The trial court assessed his testimony as "unremarkable," a conclusion we do not find plainly wrong.
In sum, the trial court was entitled to find that National Union proved its case by a preponderance of evidence and that Spillers did not advance a credible defense. This assignment does not present reversible error.

Liability of Hodge
By his second assignment Hodge claims the trial court erred in finding him a civil coconspirator with Spillers. The basis of liability for assisting another person in an unlawful act is LSA-C.C. art. 2324, which provided:
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act. (Prior to amendment by LSA-Acts 1987, No. 373)
The jurisprudence defines "an unlawful act" broadly. In Hartman v. Greene, 193 La. 234, 190 So. 390 (1939),[1] the State Supreme Court said:
That article [2324] of the Code is under the rubric of offenses and quasi offenses. Its meaning is that joint tort-feasors are liable in solido for the damage resulting from their wrongful act. The term "an unlawful act" does not mean necessarily a criminal act; it means a wrongful act, or a tortany wrongful act (not involving a breach of contract) for which a civil action will lie. 190 So. at 391. *634 See also D'Antoni v. D'Antoni, 432 So.2d 926 (La.App. 4th Cir.1983); Loesch v. R.P. Farnsworth & Co., 12 So.2d 222 (La.App. Orl. Cir.1943).
Art. 2324 also requires proof that the defendant caused, assisted or encouraged the commission of the act. In Miller v. Keating, 339 So.2d 40 (La.App. 3d Cir. 1976), amended on other grounds 349 So.2d 265 (La.1977), the court stated:
The words "assists" and "encourages," as used in Article 2324 of the Civil Code, contemplate acts performed pursuant to a conspiracy which cause injury or damage. Buras v. Machella, 172 La. 580, 134 So. 751 (1931); Tabb v. Norred, 277 So.2d 223 (La.App. 3d Cir.1973) [writ denied 279 So.2d 694 (La.1973) ]; Rush v. Town of Farmerville, 156 La. 857, 101 So. 243 (1924).
If a conspiracy is conceived and executed and a private injury results, the person injured has a cause of action against all of the conspirators. The action is for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged in the performance of those acts. Tabb v. Norred, supra, and cases cited therein. 339 So.2d at 43.
The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. The 1987 amendment to art. 2324 rephrased it in terms of conspiracy, conformably to the jurisprudence.
In support of his position that no conspiracy was shown, Hodge cites a portion of his own testimony, R.p.p. 396-402. There he states that Spillers approached him about selling 18-wheeler rearends to Howard; since Hodge did not deal in these parts, he contacted a local supplier, Mr. Plunk, and made arrangement to buy the parts and then sell them to Howard at a profit. Hodge further states the rearends were furnished to Howard by either Spillers or himself, but all were invoiced through Hodge's business. Whenever Hodge did not actually procure the part for Howard, he would credit the payment to Spillers's account; but in every instance, the part was sent to Howard.
This version of what happened is inconsistent with his admission that he bought no parts through Spillers and the marked invoices were fraudulent. R.p.p. 163, 167. It also contradicts his statement to Dep. Brooks. It does not even square with Spillers's account. In discussing Hodge's exculpatory testimony, the court characterized it as "unclear to this Court" and "never satisfactorily explained." R.p. 92. The court was more impressed with Hodge's testimony that the invoices he identified to Dep. Brooks were those he sent to Howard, at Spillers's direction and without delivering the listed parts. As with Spillers, the court believed the statement Hodge gave immediately after he was caught and confronted with the evidence. We cannot say the trial court was plainly wrong in rejecting the later, somewhat strained, version of events, in favor of the earlier one. Rosell v. ESCO, supra.
The court then addressed whether the facts proved a conspiracy as required by Miller v. Keating, supra. The court was suspicious of Hodge's claimed ignorance of Spillers's business, and elaborated:
Mr. Hodge actually testified that "he had wondered what the deal was" with Spillers and these obviously fictitious or made-up invoices, but that it was not until the Sheriff's Deputy contacted him that he went to Spillers to see what Spillers had been doing. In other words, Mr. Hodge testified that he was making out these fraudulent or fictitious invoices and sending them to Howard's and receiving payment for [them] when he had no knowledge or understanding what Spillers was doing or if Howard's was ever actually receiving any of the parts for which he, Hodge, was being paid. It is hard to understand why a man would do this unless he fully realized that it was a fraudulent scheme of some kind. R.p.p. 92-93 (emphasis added).
In short, the court was not persuaded that an innocent entrepreneur would send bills and accept payment for parts, over three years' time, that he never saw or *635 believed were delivered. If in fact Hodge had understood at the outset that Spillers was delivering the parts and that he (Hodge) was simply a middleman to avoid a company policy, then he could perhaps be justified in believing there was nothing wrong with the procedure. However, that was not Hodge's testimony. Elsewhere he said he thought the scheme was all right, as he assumed Howard was "sponsoring" Spillers's mud racer.
The trial court concluded that Hodge either had some knowledge of Spillers's fraudulent scheme, or he should have; the denials were not believable under the circumstances. We cannot say this conclusion is plainly wrong. Arceneaux v. Domingue, supra. Moreover, the court was entitled to find that but for Hodge's cooperation and the fictitious invoices, Spillers's scheme would not have been successful. This qualifies as a conspiracy. Miller v. Keating, supra.
Hodge also argues the plaintiff did not prove that the parts listed on the fictitious invoices were not delivered. We have already discussed and rejected this argument in Spillers's assignment of error. The trial court was not plainly wrong.

Quantum
By their final assignments, Spillers and Hodge contend the trial court's award was not based on sufficient, competent evidence and that no more than nominal damages were proper.
In the assessment of damages in cases of offenses, quasi offenses and quasi contracts, much discretion must be left to the judge or jury. LSA-C.C. art. 2324.1; Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971). As in cases of contracts, if the damages are susceptible of precise measurement, the court's discretion is circumscribed and damages will be measured by the loss sustained. LSA-C.C. arts. 1999, 1995; Quealy v. Paine, Webber, Jackson & Curtis Inc., 475 So.2d 756 (La. 1985); Navratil v. Smart, 400 So.2d 268 (La.App. 1st Cir.1981), writ denied 405 So.2d 320 (La.1981). The trial court obviously added up the invoices identified and marked by Hodge as fraudulent and awarded the total.
Appellants advance arguments which the trial court and this court have already rejected. There was no manifest error in accepting the February 26 statements of Hodge and Spillers and rejecting the less credible portions of their trial testimony. Spillers again relies heavily on the testimony of Steve Elliott, who stated that parts were delivered for every invoice he signed. Elliott also said, however, that he recalled going to Spillers's shop exactly once; this casts significant doubt on the reliability of his testimony.
The plaintiff's evidence was sufficient to prove its case, thus shifting the burden to the defendants. Spillers reiterates the lack of evidence from the truck files or Howard employees, but we reiterate the burden was on the defense to produce such evidence if it was favorable. Though this evidence is within the plaintiff's control, the defendants could have subpoenaed the files and deposed the employees. The defense did not do so. Under the circumstances, the trial court could have assumed the evidence would not be favorable to the defense.
Appellants also supply a discussion of "general damages" and "nominal damages." This is irrelevant because general damages were not awarded and, with adequate documentation of the loss, there is no recourse to nominal damages. See Fiesta Foods Inc. v. Ogden, 159 So.2d 577 (La. App. 1st Cir.1963), writs denied 245 La. 956, 957, 162 So.2d 10, 11 (1964).
The trial court did not err in rendering judgment in the precise amount of the invoices identified by defendant Hodge as fictitious.

Conclusion
For the reasons expressed, the trial court's judgment against Kenneth Spillers and Johnny Hodge, d/b/a Hodge Auto Supply in the amount of $67,397.28 is affirmed at appellants' costs.
AFFIRMED.
NOTES
[1] Cert. denied 308 U.S. 612, 60 S.Ct. 180, 84 L.Ed. 512 (1939); overruled on other grounds in 9 to 5 Fashions Inc. v. Spurney, 538 So.2d 228 (La.1989).