**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

No. 95-30550

---

C&B SALES & SERVICE, INC.,

                    Plaintiff-Counter Defendant-Appellant- Cross-Appellee,

versus

MAXWELL C. McDONALD, JR.,

                    Defendant-Appellee, Cross-Appellant,

versus

ROBERT L. HUMPHREY, COMPRESSION
COMPRESSOR OPERATING, INC.,

                    Defendants-Counter Claimants-Appellees.

COMPRESSOR COMPONENTS CORP; COMPRESSION
COMPONENTS CORP, erroneously refereeed to as
Compressor Components Corp.,

                    Defendants-Appellees.

---

Appeals from the United States District Court
for the Western District of Louisiana

---

September 12, 1996

Before JONES, SMITH, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

        C&B Sales & Services, Inc., filed suit against Maxwell C. McDonald, Jr., Robert L. Humphrey, Compression Components Corporation ("CCC"), and Compressor Operating, Inc. ("COI"), for fraud and racketeering. C&B now comes charging that the district court erred in its judgment and award of damages. McDonald, on cross-appeal, challenges the district court's finding that he breached his fiduciary duty to C&B and also its award of damages. For the following reasons,

we affirm the district court as to liability on the claims of fiduciary breach, fraud, and violations of the RICO statute. However, we remand for a recalculation of damages.

BACKGROUND

C&B is a Louisiana corporation that supplies new and used compressors and pumps for natural gas pipelines. W.R. Cason formed the company in 1964 and was its majority stockholder. There was a single, minority shareholder. Cason hired McDonald in September of 1980 to manage C&B's compressor rental division where he supervised maintenance and repair of rented compressors, identified opportunities for additional rentals, acquired used parts and compressors, and sold previously rented or refurbished compressors. McDonald was apparently so successful that Cason promoted him to company president in 1986. With Cason's consent, McDonald bought out the minority shareholder and became part owner of C&B.

Robert Humphrey is the owner and president of CCC, a Texas company that salvages used compressors and parts. In 1983, McDonald and Humphrey began jointly to buy and sell used gas compressors and equipment on speculation. Humphrey testified that he had made similar deals with employees of other companies in the compressor business. These associations were either joint ventures, as here with McDonald, or Humphrey would be the principal paying his cohort a finder's fee for providing him with used equipment. By this time Cason had essentially retired and did not wish to assume any additional personal financial risk with respect to C&B. Accordingly, he instructed McDonald to run the company conservatively.

Eventually CCC began to do business with C&B. As C&B's purchaser, McDonald leased compressors from CCC, with an option to buy. C&B exercised that option several times. CCC paid McDonald one-half of the profits from each of those transactions. McDonald assured Humphrey that he had disclosed his conflict-of-interest to C&B. In fact, he had not done so.

In late 1988 C&B began experiencing a cash flow problem which prevented it from purchasing equipment. Therefore the equipment that C&B had "bought" from Humphrey and

2

McDonald was retained under lease terms instead. C&B then re-leased the equipment to industry customers. Humphrey and McDonald say it was this occurrence which prompted them to form another company, COI, which they jointly owned and which leased units for CCC. CCC's principal business was the purchase and sale of used equipment, not leasing directly to oil and gas operators. Humphrey did not want CCC to appear to be in competition with its customers who were in the business of leasing equipment, so he and McDonald formed COI. Humphrey asked McDonald several times if he had informed Cason of his involvement with COI, and again he assured Humphrey there was no conflict and that he had disclosed his interests to Cason. In truth, McDonald had not disclosed his involvement with either Humphrey or COI to Cason or anyone at C&B.

In August of 1988, C&B executed a loan agreement with First National Bank of Lafayette. The terms of the agreement limited C&B's to engage in outside financing or to undertake other substantial credit obligations.

COI continued to lease additional compressor units to C&B despite C&B's continuing cash flow problems. On February 6, 1989, C&B and COI entered into a second rental agreement. Like the first, only Humphrey signed the agreement on behalf of COI. But this time, instead of Cason, only McDonald signed on behalf of C&B. Cason was not given a copy of this new rental agreement, although he asked repeatedly to see it; but McDonald never showed it to him. When asked about it, McDonald told Cason that the new rental agreement was identical to the old. However, the new agreement removed the lease/purchase provision, altered the responsibility for make ready costs, and left the pricing of the units uncertain. The new rental agreement arguably did provide more favorable terms to C&B as to subleases, as C&B had no obligation to pay rentals to COI unless the unit was subleased by C&B to a customer of C&B. Therefore, when the compressor units were idle, no rent was due from C&B to COI. The lease arrangement also initially provided that C&B was to make the compressors ready for the field (the "make ready" expenses); however, C&B could recover the expenses that it incurred in doing so in full from its customer before having to remit any portion of

3

the rental payment to COI. Of the 130 compressors operated and leased to customers by C&B, approximately 33 were owned by COI.

In 1989, Cason expressed interest in selling the compressor division. He would only agree to sell, however, if he personally would receive 2.8 million dollars net of taxes. In August of 1990, Cason entered into negotiations with Hanover Energy for the sale of the assets of the compressor division. Hanover required Cason to warrant title to C&B's equipment and customer contracts. Cason discovered at that point that despite McDonald's representations, the COI leases did not include a purchase agreement. McDonald and Humphrey then backdated a letter (the "concealment letter") establishing an agreed-upon purchase price. Just prior to closing with Hanover, C&B's attorney, William Logan, discovered, in the course of performing due diligence, that McDonald was an incorporator and director of COI.

C&B tried to delay the sale to Hanover until it could determine the extent of McDonald's involvement with Humphrey. But Hanover, which had already hired McDonald as its general manager, threatened to sue.

In accordance with the terms of the sale to Hanover, C&B's board previously had voted to award Cason and McDonald "bonuses" proportional to their respective ownership interests in C&B to be paid from the proceeds of the sale. These bonuses were necessary to meet Cason's demand of personal payment of $2.8 million after taxes. McDonald was to receive $700,000.

Around the time of the closing with Hanover, and after the disclosure of McDonald's interest in COI, counsel for Cason, Humphrey, and McDonald prepared a Mutual Act of Release and Discharge containing an indemnity provision. C&B' compressor division was sold to Hanover for $8.325 million. That price included $2.4 million for the purchase by C&B of the 33 COI units which were resold immediately, title and all, to Hanover as part of the entire transaction. In addition, Hanover paid Cason a $400,000 consulting agreement.

In light of a possible lawsuit concerning McDonald's involvement with COI, the parties agreed that his $700,000 bonus would be disbursed to McDonald's attorney, as an escrow agent

pursuant to an Escrow Agreement dated December 4, 1990. These funds were to remain in escrow pending resolution of C&B's claims against McDonald. The parties were never able to agree on a settlement of C&B's claims, so C&B filed suit on June 14, 1991.

The district court held that the Mutual Release barred suit against Humphrey, CCC, and COI, and awarded them attorney's fees. Following a bench trial, the court found McDonald liable for breach of fiduciary duty but not for fraud or civil RICO. It also found that C&B had failed to prove damages with sufficient certainty, but awarded C&B the $63,534 bonus that Hanover paid to McDonald as part of his employment agreement with Hanover, entirely proportional to the bonus it paid Cason. The court also awarded as damages the portion of the $700,000 bonus placed in escrow which had been payable to McDonald. Since $150,000 in the escrow account was earmarked for taxes and therefore not to be received by McDonald, that left $550,000 plus the interest earned on that amount while in escrow.

C&B now appeals, seeking a greater damage award and judgment against Humphrey. McDonald cross-appeals.

## DISCUSSION

We review the district court's findings of fact for clear error, but review issues of law de novo. Faulder v. Johnson, 81 F.3d 515, 517 (5th Cir. 1996).

I.      McDonald's Fiduciary Breach

The parties agree that Louisiana's rules on mandates (agency), La. Civil Code arts. 2985 et seq. govern this case. McDonald contends that portions of Louisiana's statute on corporate directors, La. Rev. Stat. §§ 12:84 and 12:91 also apply. They do dispute the proper application of articles 3005 and 3006 to the issue of damages.

According to Article 3000,

> Powers granted to persons, who exercise a profession, or fulfill certain functions, or doing any business in the ordinary course of affairs to which they are devoted, need not be specified, but are inferred from the functions which these mandataries exercise.

5

The district court, in evaluating McDonald's obligations to C&B, found that McDonald was hired because of his expertise in the compressor industry to run and manage the company in a conservative fashion, minimizing Cason's personal exposure. The court held that article 3000 applied but that Cason's instructions for running the company were general. It was this generality that gave McDonald room for rationalizing his own activities outside the company. McDonald actively concealed his outside interests, particularly evidenced by the "concealment letter" he drafted for Humphrey and in the exclusion of his name in invoices. The district court also cited McDonald's attempt to have Humphrey alter the COI documents of incorporation to show only Humphrey as owner once it became apparent that McDonald's interest in COI had become known to C&B and Cason. McDonald's own testimony at trial showed him taking positive steps to prevent Cason and C&B from learning of his interests in companies doing business with C&B. There is also McDonald's active concealment of the change in the rental agreement from lease purchase to straight lease. Based upon the evidence, the district court decided that McDonald "knew his actions were not fully justified and that he was breaching his fiduciary obligation to C&B."

> McDonald argues that he is protected by La. Civ. Code art. 3006 which states
>
> In case of an indefinite power, the attorney can not be sued for what he has done with good intention.
>
> The judge must have regard to the nature of the affair, and the difficulty of communication between the principal and the attorney.

Article 3006 has not been the subject of much modern litigation; however, McDonald says that it has been used to excuse liability on the part of an agent who lost all the assets of her principal by placing blind faith in an unscrupulous lawyer. Weinhardt v. Weinhardt, 214 So.2d 254, 256-57 (La. Ct. App. 1968). McDonald argues that his agency was indefinite, and article 3006 prevents recovery against him because he acted in good faith, albeit unwisely.

> The district court rejected this argument, finding that McDonald's actions "went beyond being unwise" and "were not wholly of good intent." In its memorandum ruling, the court stated,

> Although McDonald clearly intended for C&B to profit from his position and actions made within that position at C&B, he also intended for Maxwell McDonald to profit

6

from same.  Although McDonald had no intent to <u>injure</u> or damage C&B, he had intent for Maxwell McDonald <u>to profit</u> from the situations he created, at least in part, from the dual position McDonald held as C&B's agent and as a COI/Humphrey investor.

The court found that McDonald's responsibilities were "indefinite" largely because he refused to respond to Cason's repeated requests for information concerning the business, an example being Cason's several requests for the new rental agreement between C&B and COI.  The court rejected the application of Article 3006, finding that McDonald acted with mixed motives, intending to benefit himself and C&B.

McDonald admits to having mixed motives, but he insists that this duality is entirely consistent with having a mandate coupled with an interest.  He argues that he intended to benefit himself only to the extent he was a C&B shareholder.  In reference to Article 3006, McDonald asserts that he went out of his way to treat C&B fairly and never intended to harm the company:  there was no evidence showing that any transaction was unfair to C&B.  In addition, he claims that he believed that his mandate did not involve the purchase of used equipment.  In support, he asserts that C&B was not financially capable of making speculative purchases.  Finally, he further asserts that the nature of the mandate - to "grow" the company conservatively, without putting Cason personally at risk - and the difficulty of communicating with a semi-retired owner support his position.

With respect to Article 3005 which says,

[The mandatary] is bound to restore to his principal whatever he has received by virtue of his procuration, even should he have received it unduly[,]

McDonald contends that he profited from his own investment risk at a time that C&B was unable to make such investments, not from his "procuration" with C&B.

There are two types of transactions involved here.  The first are those in which CCC sold or leased equipment to C&B.  The second type are transactions in which CCC transacted with other companies and C&B took no part.  We consider each type in turn under the appropriate rubrics.

7

A.      <u>Self-Dealing</u>

Agency law in Louisiana requires mandataries, like McDonald, to disgorge all undisclosed benefits that they receive in dealing secretly with either their employers/principals or their employers' competitors. Texana Oil & Refining Co. v. Belchic, 150 La. 88, 90 So. 522 (La. 1922); Neal v. Daniels, 217 La. 679, 47 So.2d 44 (1950); Odeco Oil & Gas Co. v. Nunez, 532 So. 2d 453 (La. Ct. App. 1988); Robinson v. Commercial Cattle Co., 82 So.2d 108 (La. Ct. App. 1955); McDonald v. O'Meara, 473 F.2d 799 (5th Cir.), cert. denied, 412 U.S. 906, 93 S. Ct. 2293, 36 L. Ed. 2d 971 (1973). "The agent is not entitled to avail himself of any advantage that his position may give him to profit beyond the agreed compensation for his service." Odeco, 532 So. 2d at 462 (quoting Texana, 90 So. at 527). The principal need not show damage when the agent benefits secretly because it would be difficult to prove such loss. Furthermore, the agent must account for any profit he thus received "though it does not appear that the principal has suffered any actual loss by fraud or otherwise." Id. at 462-63.

We decline to differ with the district court's rejection of McDonald's argument that article 3006 applies because he acted with "good intentions." First, the district court found that he did not act with good intentions; instead, he concealed his self-dealing because he knew his conduct was untoward with respect to his duties to C&B. Second, McDonald fails to cite authority suggesting that article 3006 overrides prevailing Louisiana agency law which does not permit an agent to escape liability for an intentional violation of his fiduciary duties. McDonald committed secret double-dealing in the ordinary course of C&B's business. The district court correctly found McDonald liable for breach of his fiduciary duty to C&B.

B.    Corporation Law

Corporate officers have a fiduciary duty to their companies. La. Rev. Stat. § 12:91. Nonetheless, they are permitted to do business with their corporations when: (1) the director disclosed his interest and the board authorized it in good faith; or (2) the director disclosed his interest and the shareholders authorized it in good faith; or (3) the transaction was fair at the time it was authorized or ratified by the board, a committee, or the shareholders. La. Rev. Stat. § 12:84(A).

McDonald contends that § 12:84(A) establishes a "fairness" standard. The plain language of the statute requires both (1) disclosure and approval and (2) fairness. Thus, fairness alone is insufficient. Because McDonald failed to disclose his interest and the board never approved his activities, he cannot rely on § 12:84.

### C.    Theft of Corporate Opportunity

The district court found that McDonald's deceit excluded C&B from certain transactions in which it might have chosen to participate had it been given the opportunity. Although C&B's financial ability to buy used equipment was limited, according to the court the evidence indicated that McDonald unilaterally decided - without C&B's knowledge and without consulting Cason - whether a given deal was a risk C&B wished to or could afford to take.

McDonald seeks protection behind La. Rev. Stat. § 12:91 by claiming that the transactions involving himself, COI, and CCC with third parties were arm's length and fair; and, therefore, the standard under § 12:91 was met. Section 12:91 states:

> Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, and with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions. . . .

The district court was right not to speculate as to whether C&B, had it known of the opportunities, would have accepted them or chosen to let McDonald make those decisions for it. The court allowed for the fact that C&B was operating under constraints imposed by its loan obligations and the charge of its chief shareholder. But even these allowances do not surmount the district court's finding on good faith. McDonald's active concealment for years of his interests in relation to C&B transactions or potential transactions undermines any argument on his part that he acted fairly and to the benefit of both C&B and himself. C&B was never allowed to make those decisions for itself. We do not dispute the district court's good faith finding, and we affirm its judgment that McDonald breached his fiduciary duty to C&B.

### II.    Fraud

10

C&B contends that the district court erred in dismissing its fraud claim because: (1) self-dealing raises a presumption of fraud; and (2) deception with intent to benefit personally amounts to fraud. In support it cites Louisiana Civil Code Article 1953 which provides:

> Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one part or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.

C&B argues that it need not show specific intent by McDonald to cause loss, only that he intended to benefit personally.

According to the Louisiana Supreme Court, "Two elements are essential to constitute legal fraud: the intention to defraud and loss or damage or a strong probability of loss or damage. It is well settled that one who alleges fraud has the burden of establishing it by legal and convincing evidence since fraud is never presumed, and that to establish fraud exceptionally strong proof must be adduced." Hall v. Arkansas-Louisiana Gas Co., 368 So. 2d 984, 993 (La. 1979) (citations omitted). C&B is wrong that fraud follows merely from demonstrating a material omission and intent to obtain an unjust advantage. C&B still bears a heavy burden of showing actual damage: "Because charges of fraud carry an almost criminal connotation in Louisiana, the jurisprudence has interpreted the language of [§ 1953] with great strictness. There must be an intention to defraud causing damage to the victim. Both elements must be proved by clear and convincing evidence." Equilease Corp. v. Smith Intern, Inc., 588 F.2d 919, 923 n.4 (5th Cir. 1979).

The district court did not err in dismissing the fraud claim against McDonald. Fraud and fiduciary breach are different claims. Fraud requires actual damage, fiduciary breach does not. Additionally, damages for fraud differ from damages for fiduciary breach. While a fiduciary breach deprives the principal of the full benefits from a transaction, damages for fraud must be caused by the fraud, not by the separate fiduciary duty breach. C&B has never proved that it would have received better terms on leases if McDonald had disclosed his interest; nor has it shown that it would have pursued the lost corporate opportunities. In fact, McDonald introduced unrebutted evidence that CCC charged C&B a standard rate. When questioned about that point at trial, C&B's expert said

11

that he was unable to address it. The district court also found as a fact that C&B's financial position "virtually prohibited major capital expenditure." Thus, C&B has not met its burden of showing a "strong probability" of actual loss from the failure to disclose.

Because we uphold the district court's dismissal of the fraud claim against McDonald, there is no need to address C&B's request for attorney's fees. That request is denied accordingly.

III.    Liability of Humphrey, CCC, and COI

A.    Conspiracy

C&B seeks to hold Humphrey solidarily liable with McDonald for his breach of trust and purported fraud. Following the bench trial, the district court found as a fact that Humphrey asked McDonald on more than one occasion to disclose his interest to C&B, and that McDonald assured Humphrey that he had done so. Accordingly, it found that Humphrey had not intentionally aided McDonald's breach and declined to hold him liable.

Questions of solidary liability in Louisiana are governed by La. Civ. Code art. 2324, section (A) of which reads: "He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." This article was amended in 1987. Its prior version stated: "He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by the act." In Chrysler Credit Corp. v. Whitney Nat'l Bank, 51 F.3d 553 (5th Cir. 1995), we interpreted the amended version, stating:

> Although the 1987 amendments changed the language of La. Civ. Code art. 2324(A), the pre-amendment conspiracies still provide guidance as to the applicable law in regards to conspiracies. National Union Fire Ins. Co. v. Spillars, 552 So. 2d 627, 634 (La. Ct. App. 1989), writ denied, 556 So. 2d 61 (La. 1990) (stating that the 1987 amendment to art. 2324 "rephrased it in terms of conspiracy, conformably to prior jurisprudence").

Id. at 557 n.2. We also set out the legal standard established by this provision:

> The unlawful act is tortious conduct. The action is for damages caused by acts committed pursuant to a formed conspiracy, and all of the conspirators will be regarded as having assisted or encouraged the performance of those acts. The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy. This assistance or encouragement must be of such quality

12

and character that a jury would be permitted to infer from it an underlying agreement and act that is the essence of the conspiracy.

Id. at 557 (citations omitted). The 1987 amendment rephrased the article in terms of conspiracy: "The plaintiff must therefore prove an unlawful act and assistance or encouragement that amounts to a conspiracy." National Union Fire Ins. Co. v. Spillars, 552 So.2d 627, 634 (La. Ct. App.1989), writ denied, 556 So.2d 61 (La.1990). Accordingly, conspiracy is required before liability can be imposed under Louisiana law for aiding and abetting. Guidry v. Bank of LaPlace, 661 So. 2d 1052, 1058 (La. Ct. App. 1995), writ denied, 666 So. 2d 295, and writ denied, 666 So. 2d 295, and writ denied, 666 So. 2d 296 (1996).

C&B alleges two intentional acts with which to find Humphrey liable under a conspiracy theory: (1) breach of fiduciary duty and (2) fraud. The district court found that C&B failed to establish the requisite acts under La. Civ. Code art. 2324. Specifically, the court found that (1) Humphrey asked McDonald more than once to disclose his interest in COI to C&B and (2) McDonald assured Humphey that such disclosure had been made. The court found Humphrey's actions to be neither intentional nor willful.

The district court's factual findings on conspiracy are not clearly erroneous. The court's findings do not support an inference that Humphrey conspired with McDonald to commit an unlawful act. In fact, Humphrey's insistence that McDonald disclose his self-dealing directly contradicts such an inference. Without a conspiracy, there can be no violation of article 2324.[1]

### B.    The Mutual Release

In the course of closing the deal with Hanover, C&B released COI and its officers and directors from liability relating to the transactions involved in this lawsuit. The district court found

---

[1]In McDonald v. O'Meara, 473 F.2d 799 (5th Cir. 1973), this court held that under Louisiana law, a co-defendant is solidarily liable with a breaching fiduciary even if he acted in good faith. However, that holding has been overruled legislatively by the subsequent amendment to La. Civ. Code art. 2324(A) which limits solidary liability to co-conspirators.

13

that the release was valid, dismissed COI and Humphrey, and awarded them attorney's fees. While we agree with the district court's ruling on the validity of the release, we find the court's award of attorney's fees to be erroneous.

C&B contends that the release is invalid because it was procured by fraud and the fear of economic injury and violates public policy. It also contends that the release does not cover Humphrey personally. C&B's assertions are conclusory and have no supporting authority.

First, assuming that the release was procured through fraud, C&B cannot show that it reasonably relied on any representations. C&B admits that it already knew that McDonald owned a 50 percent interest in COI; thus, it was on notice that McDonald had engaged in double-dealing and may have diverted corporate opportunities. Second, C&B cites no authority for the proposition that fear of economic injury voids a release. Instead, it relies on La. Civ. Code art. 3079, which states that a contract may be rescinded in case of mistake, fraud, or threat of violence. Third, C&B's argument that the release does not cover Humphrey is specious: as the district court found, the plain language of the release includes officers, directors, and shareholders of COI. Finally, while contracts that violate public policy can be void in limited instances, C&B once again fails to cite any authority for the proposition that those procured by fraud fall within such an exception; in fact, such a finding would render article 3079's prohibition superfluous.

C&B is correct, however, with regard to the award of attorney's fees. In Louisiana, attorney's fees are not recoverable unless specifically included in the contract itself or where a fair reading of the agreement suggests such costs were contemplated to be covered. Perry v. Chevron U.S.A., Inc., 887 F.2d 624, 629 (5th Cir. 1989); see also Spiers v. Seal, 426 So. 2d 631, 636 (La. Ct. App. 1982), writ denied, 432 So. 2d 269 (1983), and writ denied, 432 So. 2d 270 (1983), and writ denied, 433 So. 2d 150 (1983). There is no such condition in the agreement in the case sub judice.

Humphrey, COI, and CCC argue that attorneys' fees which are incurred as a result of the wrongful act of another are a recoverable item of damages. They rely on Ramp v. St. Paul Fire and Marine Ins. Co., 269 So. 2d 239 (La. 1972), and Jenkins v. St. Paul Fire and Marine Ins. Co., 393

14

So. 2d 851 (La. Ct. App. 1981, aff'd, 422 So. 2d 1109 (La. 1982). These cases are distinguishable, however. Both involved attorney malpractice claims and allowed recovery for the cost of hiring new attorneys to do what the original, negligent attorneys had failed to do. Ramp and Jenkins only allowed the plaintiff to recover the costs of hiring attorneys to pursue a separate action. In contrast, the appellees seek the cost of having attorneys litigate the claim before the court.

> The holding of Ramp is applicable here. Plaintiff is entitled to recover the loss he has sustained by reason of having to pay attorney fees to indirectly pursue his claim against the railroad, which the defendants had obligated themselves to do without charge except on a contingent basis. The award of this item of loss or damage does not amount to an award of attorney fees incurred in order to pursue the malpractice action as such, but is to compensate for the additional cost, i. e., attorneys fees, incurred by plaintiff in order to have the railroad's liability to him judicially determined.

Jenkins, 393 So. 2d at 859.

The appellees also contend that the district court was entitled to award attorney's fees under its inherent supervisory powers, citing Chambers v. Nasco, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). The inherent supervisory power in Chambers, however, stemmed from the court's need to protect the integrity of the judicial process from unethical litigants. Nothing in Chambers suggests that power allows a court to punish behavior such as C&B's: a breach of contract that does not undermine the integrity of the judicial process. For these reasons we reverse the award of attorney's fees.

IV.    Damages

The district court found that C&B failed to prove damages with sufficient certainty, but then it awarded an amount under a statute permitting it to make a reasonable assessment when damages cannot be proven with certainty. Both C&B and McDonald appeal that award.

The district court found that C&B failed to segregate McDonald's take from the amount Humphrey, COI, and CCC received. C&B argues that it need not distinguish McDonald's take from the rest because he and Humphrey are solidarily liable as co-conspirators. This argument is meritless; we have already held that the district court's finding that they did not conspire is not clear error.

15

The district court further found that C&B bore the burden of showing the amount of McDonald's profits, i.e., his gross revenues and his expenses. C&B argues that the court should have switched the burden to McDonald with respect to showing his expenses.

Then-Justice Dennis succinctly stated the general rule:

> In an action against a mandatary . . . for an accounting, the burden is on the principal to show that the mandatary received the funds or property and the amount or quality thereof, and thereafter the burden is upon the mandatary . . . to establish what disposition was made of the money or property.

Savoie v. Estate of Rogers, 410 So. 2d 683, 688 (La. 1981), as amended (1982), writ denied, 445 So. 2d 1227 (1984). By that language, C&B must show the revenues received by McDonald; and McDonald must then show how much of that was profit. However, since C&B failed to show the amounts received, the burden never shifted to McDonald.

After concluding that C&B had proved the fact of damages but not the amount, the court exercised its discretion to assess reasonable damages pursuant to La. Civ. Code art. 1999, which states "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." In assessing what it felt to be reasonable damages, the court settled on the pro rata shareholder "bonus" that Hanover paid McDonald upon acquiring C&B's compressor division. This bonus was a part of the purchase price, directly proportional to the value of the division. The district court reasoned that as the company's value was largely a function of McDonald's management, including his self-dealing and diversion of corporate opportunities, the company's sales price was related to his self-dealing.

The initial inquiry is whether the award is appropriate "for the particular injuries and their effects under the particular circumstances on the particular injured person." Youn v. Maritime Overseas Corp., 623 So. 2d 1257, 1260 (La. 1993), writ granted, 609 So. 2d 240, cert. denied, 508 U.S. 910 (1993). An award is acceptable if it "bear[s] a reasonable relationship to the elements of the proved damages." Id. at 1261.

Having studied the district court's ruling and the record, we readily conclude that the court made a painstaking effort to properly assess damages in this complex case. Where absolute accuracy

16

is not possible, the district court necessarily has broad discretion in measuring damages. Nonetheless, there must be a logical nexus between the breach of fiduciary duty committed by McDonald and the damages awarded. Indeed, to the extent that the instant award appropriates McDonald's share of the profits on the sale of C&B, it is taking away not the value that he purloined from the company, but instead the value that he obviously worked hard to impart to it. We are constrained to conclude that the measure of damages determined by the district court is thus squarely contrary to the damages suffered by C&B.

In conducting a proper estimation of damages under art. 1999, the court may consider averages or formulas to approximate the profits made by McDonald. See Mobil Exploration & Producing U.S. v. Cajun Constr. Servs., 45 F.3d 96, 102, n.20 (5th Cir. 1995). As a result, the court might choose to return to C&B's report. Despite the report's apparent shortcomings, the court might be able to identify the number of transactions and a likely average (or at least minimal) profit per transaction. As McDonald got one-half of all profits, one-half of that amount would be a reasonable approximation.

Alternatively, the court might be able to determine the approximate gross revenues of the joint venture and COI. As McDonald bears the burden of showing expenses and owns one-half of both entities, calculation of profits from transactions involving those two entities would then be possible.[2]

Again, given the short, overreaching and undifferentiated evidence of damages submitted by C&B, we do recognize the difficulty the district court faces in calculating the proper measure of damages. While McDonald cannot escape liability through the use of confusing accounting practices, C&B is entitled only to what the district court concludes, within its broad discretion, is a fair assessment of actual damages. A perfect fit is not mandated, only a fair one.

---

[2]We are, however, mindful, that the district court would need to use a different method of calculating profits from transactions involving CCC inasmuch as McDonald may not have been involved in all of CCC's business activities.

17

V.    Prejudgment Interest

C&B contends that the district court erred in denying prejudgment interest. Article 3015 states "[t]he attorney is answerable for the interest of any sum he had employed to his own use, from the time he has so employed it; and for that of any sum remaining in his hands from the day he becomes a defaulter by delaying to pay it over." By the plain language of this statute, McDonald is liable for prejudgment interest running from the dates on which he acquired them. We therefore reverse the district court's judgment on this issue and grant prejudgment interest in favor of appellant.

VI.    RICO

C&B appeals the dismissal of its RICO claims based on conspiracy, fraud, and bribery. C&B's claim against McDonald was pursuant to 18 U.S.C.A. § 1962(b) which reads in pertinent part: "a person, cannot acquire or maintain an interest in an enterprise through a pattern of racketeering." Citing In re: Burzynski, 989 F.2d 733 (5th Cir. 1993) and Delta Truck and Tractor, Inc. v. J. I. Case Company, 855 F.2d 241 (5th Cir. 1988), the district court rejected the RICO claims against McDonald. Upon reviewing the totality of the evidence before it, the district court concluded that C&B failed to prove with sufficient credible evidence the requisite continuity prong for meeting the pattern of racketeering prong of the RICO statute. The court further found that C&B failed to present sufficient credible evidence to establish that McDonald acquired or maintained an interest in C&B through a pattern of racketeering. Similarly, the court rejected C&B's RICO claim based on § 1962(c) which, in effect, alludes to the use of bribery to control the affairs of the enterprise, i.e., C&B. The court specifically stated:

> This court finds that as to Humphrey, COI and CCC, plaintiff did not present sufficient credible evidence to establish that they were in any way bribing Mr. McDonald or that Mr. McDonald was in any way bribing or receiving a bribe by way of C&B. Rather, the more credible evidence presented established that Mr. Humphrey was of the belief that Mr. Cason was fully aware of what was going on and of Mr. McDonald's involvement as well as Mr. Humphrey's involvement in the transactions and/or business dealings.

Because of this factual finding, the court wholesalely rejected the RICO claim predicated on a finding of bribery by either McDonald or Humphrey.

18

The trial court noted that C&B brought a RICO claim under § 1962(d) which states in pertinent part, "a person cannot conspire to violate a subsection." In this case, it would be 1962(c). Based on the foregoing factual findings by the district court, it similarly rejected the 1962(d) claim.

The conspiracy argument fails for the reason that Humphrey is not solidarily liable: he never entered into an agreement to commit an intentional tort. Further, as Humphrey had no fiduciary duty to C&B, his omissions were not fraudulent. Moreover, the district court found the evidence did not form the basis of a claim in fraud. On the commercial bribery claim, C&B looks only to Tex. Pen. Code § 32.43. Under that section, however, the plaintiff must show that the offeror acted with a culpable mental state. See Ex Parte Mattox, 683 S.W.2d 93, 97 (Tex. Ct. App. 1984). As the district court found that he acted in good faith, Humphrey is not guilty of bribery.

Having reviewed the record in great detail, this court finds no error in the district court's rejection of all the RICO claims.

VII.     McDonald's Reply Brief

As cross-appellant, McDonald may file a reply brief responding to C&B's response to McDonald's appeal. C&B filed a motion to strike that brief, arguing that it primarily addresses the merits of C&B's appeal and so is not responsive to C&B's response to McDonald's appeal.

We find McDonald's reply brief sufficiently responsive on the issues assigned as error in his cross appeal. Therefore, C&B motion to strike said brief is hereby denied.

VII.     Statement by Humphrey's Counsel at Oral Argument

Finally, counsel for C&B makes the grave allegation that Humphrey's attorney intentionally misled this court at oral argument. He specifically charges that Humphrey's attorney told this panel that Humphrey "never entered into joint ventures with employees of other companies similar to that alleged in this case." This alleged statement is supposedly at odds with Humphrey's trial testimony in which he identified several employees of other companies with whom he had similar dealings. There is no basis for C&B's charge. At oral argument Humphrey's attorney simply refuted the charge that Humphrey always operated through the employees of other companies. His next

19

statement was that there were, however, "some individuals with whom Mr. Humphrey had had similar deals." The frequency with which Humphrey approached others for his deals, not the fact of his ever using this method of operation, was the assertion with which Humphrey's attorney disagreed, and no more.

## CONCLUSION

For the foregoing reasons we AFFIRM the judgment of the district court on the issues of liability as to fiduciary breach, fraud, solidary liability, and RICO. We REVERSE the award of attorney's fees and denial of prejudgment interest. We AFFIRM and REMAND on damages for a determination of an appropriate award.