487 So.2d 106 (1986)
Robert Joseph HARVEY
v.
The TRAVELERS INSURANCE COMPANIES, Logistics Express, Inc., Big Three Industries, Inc., and ABC Insurance Company.
No. CA 4043.
Court of Appeal of Louisiana, Fourth Circuit.
March 12, 1986.
*107 Frank J. D'Amico, and Ronald A. Welcker, Dennis J. Phayer, Vincent Glorioso, Jr., Glorioso, Welcker & Zaunbrecher, New Orleans, for plaintiff-appellant.
R.K. Christovich, Christovich & Kearney, New Orleans, for defendants-appellees.
Before GULOTTA, SCHOTT and GARRISON, JJ.
SCHOTT, Judge.
Plaintiff, Robert Joseph Harvey, was injured while he was a passenger in his own tractor being operated by his employee, John Mason. The vehicle overturned just outside of a gate to a plant owned by defendant, Big Three Industries, Inc. From a judgment in plaintiff's favor against Big Three for $239,388.50 both parties have appealed with both contesting quantum and Big Three contesting liability as well. Big Three contends the trial court erred in permitting plaintiff to use the deposition of John Mason at trial and in failing to find that plaintiff was its statutory employee. As to quantum the trial court found that plaintiff's injuries would have entitled him to recover $478,777 but this was reduced by fifty percent because of his refusal to allow surgical pins to be removed from his hip. Both sides contend the trial court abused its discretion in the net amount of the award.
Plaintiff had contracted with Logistics Express, Inc. for the use of his tractor to transport shipments for Logistics. Pursuant to this agreement Logistics sent plaintiff to Big Three's plant to pick up a load of liquid oxygen on June 28, 1980. Plaintiff and Mason had gotten the load and were leaving the plant when the accident occurred.
Plaintiff testified that as Mason was driving through the gate he suddenly accelerated the vehicle and plaintiff "hollered at him" because he knew something was wrong. Mason said, "They're closing the gate." There was a "sudden surge" of the liquid load, the tractor turned to the right, and the vehicle turned over.
The steel gate was controlled remotely by an operator who had no view of it. He testified that he was told by a fellow employee to close the gate, and the fellow employee testified that he told the operator to close the gate after seeing plaintiff's rig stopped outside of the gate.
*108 Plaintiff produced an expert witness who testified that the exit was inherently dangerous because the distance between the gate and the highway was only sixty-two feet, the area was insufficient to accommodate a large vehicle making a right turn, and there were no controls to insure safe operation of the gate.
In extensive reasons for judgment the trial court said the following on the issue of Big Three's conduct being a cause-infact of plaintiff's injury.
"A prodigious amount of uncontradicted evidence was presented as to physical design of the plant entranceway, gate controls and plant layout. The court concludes that Big 3's design, construction and gate operational controls constituted a "trap" and/or were negligent. It was grossly unsafe to place the gate control in a remote room that did not have direct or indirect observational features of traffic entering or exiting the plant onto a major state highway. Additionally, the mouth of the driveway is insufficient to accommodate 18 wheel-tractor-trailor units that will foreseeably have to make unexpected starts and stops before proceeding onto the highway while hauling heavy loads. Appended to this is the fact that the radius for a right turn is inadequate and unsafe as compared to the left.
Conflict in testimony exists as to whether the gate closed on plaintiff's vehicle while it was moving through the front gate or whether it was closed prior to the accident. The court was unimpressed with defendant's employee witnesses on this issue and for many reasons rejects their version that the gate closed prior to the accident. The court accepts Mason's testimony as the most credible.
The court concludes that "but for" the negligence of the gate operator in closing the gate as plaintiff's vehicle was departing which caused Mason to speed up to avoid the contact in combination with the negligent design of the plant entrance onto the highway, the accident would not have occurred. Accordingly, the defendant's conduct was the cause in fact of the accident."
The trial judge obviously assigned great weight to Mason's testimony which was in the form of a videotape deposition. Big Three's timely objection to this deposition was overruled by the trial court. This ruling is the subject of Big Three's first assignment of error. Big Three contends that plaintiff failed to establish entitlement to use the deposition under any of the conditions of LSA-C.C.P. Art. 1450(3) which provides as follows:
(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds: (a) that the witness is dead; or (b) that the witness is at a greater distance than one hundred miles from the place of trial or hearing, or is out of this state, unless it appears that the absence of the witness was procured by the party offering the deposition; or (c) that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; or (d) that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; or (e) upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used.
Plaintiff attempted to qualify the deposition's use under condition (b) by means of his own testimony that he located Mason's present place of employment and was told that he was in Oklahoma. Since this was hearsay it could not be considered to prove the unavailability of the witness McKinley v. Dalton, 355 So.2d 1033 (La. App.4th Cir.1978). Thus, the deposition was not admissible under condition (b). Next, plaintiff argues admissibility under condition (d), but he failed to establish that he was unable to serve Mason with a subpoena. He established only that Mason travels and was not in town on different *109 days when he called Mason's employer. On the other hand, Mason resided in Jefferson Parish and his employer was also in Jefferson. There was no showing that a subpoena had ever been issued much less given to the sheriff for service. We have concluded that the use of the deposition cannot qualify under this condition. Arsenaux v. Arsenaux, 417 So.2d 856 (La. App.4th Cir.1982), writs granted, 420 So.2d 450, reversed on other grounds, 428 So.2d 427 (La.1983) relied upon by plaintiff to authorize the deposition's use under condition (d) is distinguishable because there subpoenas were issued for two witnesses and one was served but did not appear at the trial. The other was not served but the record showed that three different addresses were given to the sheriff and attempts to serve him began over six weeks before trial.
We have thus concluded that the trial court erred in allowing plaintiff to use Mason's deposition. However, because there is other evidence in the record to prove that Big Three was at fault and caused the accident we deem the error to be harmless. In his reasons for judgment the trial judge rejected the testimony of defendant's employee that the rig was outside the gate when he told the other employee to close the gate. We are likewise convinced that this testimony was not credible because it provides no logical explanation whatsoever for the accident considering that the rig was fifty-five feet long and the distance between the gate and the highway was sixty-two feet. This would leave only seven feet for the truck to turn over from a stopped position.
Harvey's testimony that Mason sped up because the gate was closing on them in combination with the testimony of the expert as to the dangerous condition of the exit and the inability of the gates' operator to know when to close the gate support the conclusion that Big Three was at fault and this fault was a legal cause of the accident.
Big Three's next assignment is that plaintiff was its statutory employee whose exclusive remedy was in worker's compensation. In order for plaintiff to qualify as Big Three's statutory employee he had to be an employee of Logistics with whom Big Three contracted to do the hauling. R.S. 23:1032; R.S. 23:1061; Lewis v. Exxon Corp., 441 So.2d 192, 197 (La.1983). In the contract between plaintiff and Logistics they agreed he was not an employee in the following paragraph:
VI. RELATIONSHIP OF THE PARTIES
The relationship created by this agreement is intended by both parties to be that of carrier (LOGEX) and independent contractor (OWNER), and not that of employer-employee. All interpretations of this agreements and all actions of the parties in the execution of the terms and provisions thereof shall be made is such a way as to maintain the relationship of carrier and independent contractor between the parties.
Factors to be considered in deciding whether the employee relationship exists are the right of control and supervision, selection and engagement, payment of wages and power of dismissal. Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188 (La.1977). Plaintiff furnished his own equipment and driver, kept his own schedule, and was free of any control by Logistics. His only connection with Logistics on a given job was to learn the origin and destination of the load and to collect the compensation due him under the contract. The contract did not provide for wages but compensation to the owner for the use of his truck. When the truck was not engaged in hauling for Logistics plaintiff was free to use his truck for any other purpose including hiring it out to another company like Logistics. The contract does not contemplate dismissal or "firing" by Logistics but termination of the contract to use plaintiff's equipment. These circumstances lead to a conclusion that plaintiff was not an employee of Logistics so as to support Big Three's theory that he became its statutory employee.
*110 Although the foregoing conclusion is clearly warranted, Big Three contends that Harvey must be considered an employee of Logistics because he made a worker's compensation claim against and settlement with Logistics and its insurer for the injuries he sustained. In these pleadings he admitted he was an employee of Logistics, and all of this material was stipulated into evidence at the trial of the present case in order to accommodate the intervening compensation carrier.
For reasons of their own Logistics and its insurer voluntarily paid worker's compensation benefits to Harvey and acquiesced in his assertion that he was an employee. Their intention like plaintiff's was to treat him as an employee for the limited purpose of entitlement to and settlement of compensation benefits. Big Three had no interest in this arrangement. At this point Big Three as defendant in a tort suit has the burden of proving its affirmative defense of plaintiff's statutory employee status. We have concluded that the admissions by plaintiff in the worker's compensation case were made for a limited purpose understood between those parties and they cannot be construed as some sort of a judicial admission in favor of Big Three in the present case sufficient to negate the large body of evidence that plaintiff was not an employee of Logistics.
Having concluded that the trial judge correctly found Big Three to be liable we turn to the quantum issues raised by both parties. Plaintiff suffered a hip fracture in the accident which necessitated an open reduction with fixation of plate and screws. This was performed on the second day after the accident by Dr. Richard E. McCall, an orthopedist. From the very beginning Dr. McCall advised plaintiff the hardware would have to be removed. After a satisfactory recovery plaintiff was discharged in April, 1981 and returned to work driving his truck. However, by November his hip began to bother him and it grew worse until March 1982 when he discontinued driving and consulted Dr. Ralph Gessner, another orthopedist.
Dr. Gessner testified that plaintiff complained of hip pain and had a noticeable limp. Examination disclosed limitation of motion and shortening of the leg. X-rays of the pelvis revealed the compression device previously implanted in the hip. Dr. Gessner thought the surgery had obtained a good reduction of the hip but plaintiff was developing traumatic arthritis caused by the compression screw in the femoral head. He recommended that the hardware be removed to avoid its migration through the femoral head and a great deal of additional difficulty. Dr. Gessner next saw plaintiff in June, 1982 and continued to see him until December 1983. By this time his condition had progressively worsened to the point where Gessner felt a total hip replacement might become necessary. He explained this as major surgery involving removal of the hardware and part of the femoral neck and replacement with a metal prothesis. He estimated the expenses for the surgery would amount to $23,000. Dr. Gessner considered plaintiff totally disabled as a truck driver and capable only of sedentary work.
The trial judge found plaintiff's injuries warranted a recovery of $478,777 consisting of $300,000 for pain and suffering, $158,777 for lost wages and impairment of earning capacity and $20,000 for future medical expenses. However, he reduced the recovery by fifty percent because plaintiff had declined to have the hardware removed. Big Three contends that if plaintiff had had this done by Dr. McCall in 1981 none of these serious problems would have developed so that he is entitled to compensation only for injuries and disability over a ten month period.
In response to questions by the trial judge, Dr. Gessner stated that he had recommended removal of the hardware in March, 1982 but it was still possible to save the hip by removing the hardware as late as December, 1983. However by the time of the trial in October, 1984 it was too late and replacement of the hip was necessary.
The trial court was faced with a difficult task in assessing quantum. Dr. *111 McCall did not testify and while plaintiff admitted he was told by McCall in 1981 to have the hardware removed he was nevertheless discharged and told to return to work. The only medical testimony that the hardware had to be removed came from Dr. Gessner. Although he knew the hardware had to be removed when he first saw plaintiff in March, 1982, Dr. Gessner stated it was not until December, 1983 that he "really suggested that he have something removed" from the hip (Vol III, page 129). This testimony suggests that plaintiff's duty to mitigate his damages by submitting to the surgery to remove the hardware did not arise until December, 1983. At this point he had already undergone pain and suffering and lost income for three and one-half years with a remission of a few months when he had returned to work. In itself, this evidence disproves Big Three's theory that plaintiff would have had an injury of only ten months duration but for his refusal to submit to the additional surgery. But in addition, Big Three's theory is based upon the assumption that had plaintiff submitted to the surgery he would have recovered completely and without any residuals from his injury. There is no evidence to support this assumption. On the contrary, when asked whether the hip replacement would have been necessary had the hardware been removed in 1982 Dr. Gessner replied, "It may not have. I cannot say." (Vol. III, p. 116). Again, when asked whether removal of the hardware in March or June, 1982 would have alleviated plaintiff's arthritis condition Gessner answered, "I think it may have, may have helped, you know, I can't say." (p. 118).
On the other hand, there is no support for plaintiff's theory that his duty to mitigate did not encompass submission to surgery for removal of the hardware. He relies upon Jacobs v. New Orleans Public Service, Inc., 432 So.2d 843 (La.1983) for the proposition that his decision was not unreasonable. However, this case dealt with the plaintiff's decision to discontinue psychiatric treatment the value of which was seriously questioned. In the instant case the evidence is clear to the effect that the hardware removal procedure would have taken only forty-five minutes and was not risky. There is no evidence as to its cost. The evidence established that much of plaintiff's present difficulty is the result of his failure to submit to the procedure. We agree with the trial court that his decision was unreasonable.
We have concluded that the award was well within the bounds of the trial court's discretion and, accordingly, the judgment is affirmed.
AFFIRMED.
GARRISON, J., concurs in part and dissents in part.
GARRISON, Judge, concurring in part and dissenting in part.
I agree that the court below correctly decided the case in plaintiff's favor and correctly assessed the damages at $478,777. However, I believe that the court abused its discretion in then reducing the quantum by 50% and that, considering the circumstances of the case, this constituted manifest error.
The evidence did not support the conclusion that Harvey failed to adequately mitigate his damages. Dr. Gessner clearly was uncertain as to whether or not the "hardware removal surgery" would have obviated the need for hip replacement and was equivocal as to whether it would even partly have alleviated the plaintiff's arthritic condition. Considering the circumstances in which the latter found himself it appears to me to be harsh justice to conclude that he was unreasonable in failing to submit to further surgery.
I find the Jacobs v. New Orleans Public Service, Inc. (and the cases therein cited) case to be quite applicable and not distinguishable simply because it concerned psychiatric treatment. In the instant case the standard elucidated in Jacobs was followed by the plaintiff. He exercised reasonable diligence and ordinary care to minimize his damages. His recovery should not have been limited because of his refusal to undergo *112 surgery which offered such marginal promise for a successful recovery from his injuries.
Consequently, he should have received the full assessment of damages of $478,777 assessed by the court.