690 So.2d 124 (1997)
Leonard STEPHENS and Mary Stephens, et al.
v.
BAIL ENFORCEMENT OF LOUISIANA, et al.
No. 96 CA 0809.
Court of Appeal of Louisiana, First Circuit.
February 14, 1997.
Order Granting Rehearing April 2, 1997.
Writ Denied April 18, 1997.
*126 Steve LeBlanc, Baton Rouge, for Plaintiff/Appellee Leonard Stephens.
A. Wayne Stewart, Albany, for Plaintiff/Appellee Mary Stephens.
Ann Dillard, Omega, pro se.
William Faller, Hammond, for Defendant/Appellant Citizens & Southern National Bank.
George G. Angelus, New Orleans, for Defendant Monte Lambert.
Thomas Peak, Baton Rouge, for Defendant The Atlantic Mutual Insurance Company.
Arthur J. O'Keefe, New Orleans, for Defendants Charters Insurance Agency, Inc. and Eric T. Schmidt.
Kevin Rung, New Orleans, for Defendant American Bankers Insurance Company.
William Noland, New Orleans, for Defendant Steve's Bail Bonds.
Graham N. Smith, Robert M. Mahony, Lafayette, for Defendant Citizens and Southern National Bank.
Before CARTER, LeBLANC and PARRO, JJ.
CARTER, Judge.
This appeal arises out of an action for damages.

BACKGROUND
In August, 1989, Leonard Stephens, a resident of Tifton, Georgia, purchased a 1987 Chevrolet S-10 pick-up truck and obtained financing from Citizens & Southern National Bank (C & S) in Tifton, Georgia. Shortly thereafter, Stephens was involved in a domestic dispute with his spouse, Mary Alice Stephens. As a result of this episode of domestic violence, criminal charges were filed against Stephens. Georgia State Bonding Services (Georgia Bonding), owned and operated by Ann and Sirman Dillard, posted a bond to secure Stephens' release from jail. Stephens and his spouse subsequently resolved their difficulties and relocated to Maurepas, Louisiana. Stephens did not make his payments to C & S on the truck, and the note became delinquent.

FACTS
In 1990, several attempts were made to secure Stephens' return from Louisiana to Georgia on the bail bond. In February, 1990, Sirman Dillard and an associate with Georgia Bonding came to Louisiana, located Stephens, and advised him that he was under arrest and that he and the Chevrolet truck would be returned to Georgia. On April 15, 1990, two bounty hunters associated with Bail Enforcement of Louisiana (Bail Enforcement), namely, Monte Lambert and Lucien Lailhengue, arrived at the Stephens home, trying to secure Stephens and obtain the pick-up truck. Five days later, a group of bounty hunters, headed by Wendell Keith Rhodus of Bail Enforcement, returned to the Stephens home in the middle of the night, grabbed Stephens, placed him in a car, and left the area. During this last incident, Stephens was brutalized. Stephens was later delivered to Sirman Dillard in Pensacola, Florida, who returned Stephens to Georgia. The truck financed by C & S was never returned.
On May 21, 1990, Leonard and Mary Alice Stephens, individually and on behalf of their three minor children (the Stephens), filed a suit for compensatory and punitive[1] *127 damages against Bail Enforcement, Georgia Bonding, O.D. (Sirman) and Ann Dillard, C & S, Wendell and Claudia Rhodus, Monte Lambert, Clyde Lailhengue, Jr., Bobby Hollingsworth, Lucien Lailhengue, and Louis Marcotte. The Stephens later amended their petition and named additional defendants, including American Bankers Insurance Company of Florida (American Bankers), B.J. Morris, Charters Insurance Agency, Inc., Eric T. Schmidt,[2] and Steve's Bail Bonds.
Clyde Lailhengue, Ann Dillard, Steve's Bail Bonds, Charters Insurance Agency, Inc., and Eric T. Schmidt answered the Stephens' petitions, denying the allegations. American Bankers answered the Stephens' petitions, generally denying the allegations of the petition, and filed a third-party demand against the defendants named in the main demand. C & S answered the petitions, denying the allegations. In its answer, C & S admitted that it made a loan on a 1987 pick-up truck to Leonard Stephens at its offices in Tifton, Georgia, on August 29, 1989, and that Leonard Stephens made no payments on the loan.[3] C & S alleged that, in connection with a bail bond claim, Sirman Dillard located Stephens in Louisiana and offered to request that Stephens return the truck. C & S further alleged that neither Dillard, Bail Enforcement, or Georgia Bonding were agents, servants, or employees of C & S and that C & S was not involved with the alleged actions taken against Stephens in Louisiana.
After a trial on the merits, on April 25, 1995, the trial court rendered judgment in favor of the Stephens and against C & S, Sirman Dillard, Wendell and Claudia Rhodus, Monte Lambert, and B.J. Morris for $3,500,000.00, together with legal interest from date of judicial demand until paid.[4] The claims against American Bankers and Ann Dillard were dismissed.
From this adverse judgment, C & S suspensively appealed, raising the following issues:
1. Can C & S be held liable for the tortious acts of the bounty hunters when C & S did not employ the bounty hunters, and neither knew about nor had any interest in their tortious acts?
2. Was there any employer-employee relationship between C & S and the bounty hunters who committed tortious acts upon the plaintiff, Leonard Stephens?
3. Is there any competent evidence to hold C & S liable for the tortious acts of the bounty hunters?
4. Were the tortious acts of the bounty hunters within the course and scope of any employment relationship between C & S and the bounty hunters?
5. Was there any competent evidence to support the finding of the Trial Court that C & S was a full working partner in the entire illegal and tortious series of events described in the findings and that the bounty hunters were working for C & S in attempting to return plaintiff, Leonard Stephens, to the state of Georgia in order to satisfy bonds posted to guarantee his appearance on the criminal charges pending against Stephens in Georgia brought against him by his wife?
6. Did C & S have such right of control over the acts of Wendell Keith Rhodus, Monte Lambert, and other bounty hunters employed by Bail Enforcement of Louisiana so as to constitute an employer/employee relationship between C & S on the one hand and Wendell Keith Rhodus, Monte Lambert, and other bounty hunters employed by Bail Enforcement of Louisiana on the other hand so as to render C & S liable under the doctrine of [respondeat] superior for the actions of the bounty hunters?
7. Is the judgment a nullity because the Trial Court cast defendants in judgment who were never served, entered preliminary defaults on the day of trial against defendants who had never answered, and *128 confirmed defaults on the same day that the preliminary defaults were entered?
8. Is the judgment a nullity because the Trial Court proceeded to trial over objection without dismissing defendants who had not answered?
9. Is the judgment a nullity because the Trial Court proceeded to trial over objection despite the fact that not all defendants had been given notice of the trial?
10. Did the Trial Court abuse its discretion and award excessive damages?
11. Is the judgment a nullity because it does not allocate damage awards to individual plaintiffs and because it does not allocate fault among the defendants who had been found liable?
12. Can a judgment which makes no mention of solidary liability be considered a judgment of liability in solido by virtue of the fact that the findings of facts and reasons for judgment refer to solidary liability?
The Stephens answered the appeal, requesting attorney's fees and contending that the damage award was insufficient. On appeal, the Stephens failed to brief their contentions that the damage award was insufficient or that they were entitled to attorney's fees, and, pursuant to Uniform RulesLouisiana Courts of Appeal, Rule 12.2-4, those alleged errors are abandoned.
The only defendant to appeal from the trial court judgment was C & S. Therefore, the trial court judgment is final as to all other defendants, and the only issues before us in this appeal concern the liability of C & S. Further, although the same counsel represented Leonard and Mary Alice Stephens before the trial court, on appeal, Mary Alice Stephens, individually and on behalf of the minor children, and Leonard Stephens, individually and on behalf of the minor children, retained separate counsel, each of whom filed briefs on behalf of their clients.
Leonard Stephens subsequently compromised and settled his individual claims against C & S. Pursuant to a motion and order of partial dismissal of appeal, C & S dismissed that portion of its appeal from the judgment rendered in favor of Leonard Stephens, individually. The order dismissing that portion of the appeal was signed on December 6, 1996. After the dismissal of the appeal of C & S as to Leonard Stephens, individually, the only issues before this court are the liability of C & S to Mary Alice Stephens and the minor children and the propriety of the damage award.
C & S filed numerous motions with this court, including a motion to reduce supersedeas bond,[5] a motion to enlarge the record,[6] and a motion to remand to the trial court for an enlargement of the pleadings. The motion to remand seeks substantially the same relief requested in the motion to enlarge the pleadings.

LIABILITY OF C & S
C & S contends that the trial court erred in finding it liable to the Stephens. C & S reasons that, in their pleadings, the Stephens asserted two theories of recovery against C & S, namely, liability, as a master, for the tortious acts of its alleged servants (Dillard, Rhodus, and/or Lambert) under LSA-C.C. art. 2320 and solidary liability as a civil co-conspirator with Dillard, Rhodus, and/or Lambert under LSA-C.C. art. 2324 A.

A. Liability as Master for acts of Servant.
Under the doctrine of respondeat superior expressed in LSA-C.C. art. 2320, "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in *129 which they are employed." Urbeso v. Bryan, 583 So.2d 114, 116 (La.App. 4th Cir.1991); Alexander v. Rivers, 560 So.2d 999, 1003 (La.App. 4th Cir.1990).
Under this doctrine, a master or employer is liable for the tortious conduct of a servant or employee which is within the scope of authority or employment, but a principal is not liable for the physical torts of a non-servant agent. Rowell v. Carter Mobile Homes, Inc., 500 So.2d 748, 751 (La.1987);[7]Blanchard v. Ogima, 253 La. 34, 215 So.2d 902, 906 (1968). Liability for the negligent and tortious acts of another does not flow simply because of a principal-agent or principal-mandatary relationship. Rowell v. Carter Mobile Homes, Inc., 500 So.2d at 751. Rather, when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance, which is characteristic of the relation of master and servant, only then does the person in whose service the act is done become subject to liability for the physical tortious conduct of the actor. Rowell v. Carter Mobile Homes, Inc., 500 So.2d at 751; Daniels v. Dauphine, 557 So.2d 1062, 1065 (La.App. 2nd Cir.), writ denied, 561 So.2d 100 (La.1990). Therefore, it is the right of control and supervision, selection and engagement, payment of wages, and the power of dismissal that determines whether an "employee" status exists. Harvey v. Travelers Insurance Companies, 487 So.2d 106, 109 (La.App. 4th Cir.1986). See Ermert v. Hartford Insurance Company, 559 So.2d 467, 476 (La.1990).

B. Liability as Co-Conspirator.
The basis of liability for assisting another person in an unlawful act is LSA-C.C. art. 2324 A. Prior to amendment by Acts 1987, No. 373, § 1, LSA-C.C. art. 2324 provided as follows:
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
The jurisprudence defined "an unlawful act" broadly. In Hartman v. Greene, 193 La. 234, 190 So. 390, 391 (1939), cert. denied, 308 U.S. 612, 60 S.Ct. 180, 84 L.Ed. 512 (1939), the Louisiana Supreme Court stated:
That article [2324] of the Code is under the rubric of offenses and quasi offenses. Its meaning is that joint tort-feasors are liable in solido for the damage resulting from their wrongful act. The term "an unlawful act" does not mean necessarily a criminal act; it means a wrongful act, or a tort any wrongful act (not involving a breach of contract) for which a civil action will lie.
See D'Antoni v. D'Antoni, 432 So.2d 926, 928 (La.App. 4th Cir.1983).
Prior to its amendment, LSA-C.C. art. 2324 also required proof that the defendant caused, assisted, or encouraged the commission of the act. National Union Fire Insurance Company of Pennsylvania v. Spillars, 552 So.2d 627, 634 (La.App. 2nd Cir.1989), writs denied, 556 So.2d 61 (La. 1990). In Miller v. Keating, 339 So.2d 40, 43 (La.App. 3rd Cir.1976), amended on other grounds, 349 So.2d 265 (La.1977), the court stated:
The words "assists" and "encourages," as used in Article 2324 of the Civil Code, contemplate acts performed pursuant to a conspiracy which cause injury or damage. Buras v. Machella, 172 La. 580, 134 So. 751 (1931); Tabb v. Norred, 277 So.2d 223 (La.App. 3 Cir.1973), [writ denied, 279 So.2d 694 (La.1973)]; Rush v. Town of Farmerville, 156 La. 857, 101 So. 243 (1924).
However, the 1987 amendment to LSA-C.C. art. 2324 rephrased the law in terms of "conspiracy." Guidry v. Bank of LaPlace, 94-1758, p. 10 (La.App. 4th Cir. 9/15/95); 661 So.2d 1052, 1058, writs denied, 95-2498, 95-2477, *130 95-2490 (La.1/5/96); 666 So.2d 295, 296. As a result, under LSA-C.C. art. 2324, liability cannot be imposed for aiding and abetting in the absence of a conspiracy. Guidry v. Bank of LaPlace, 661 So.2d at 1058.
At all pertinent times, LSA-C.C. art. 2324 A provided as follows:
He who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act.
A conspiracy is defined in Black's Law Dictionary 309 (6th ed.1990), as a "combination or confederacy between two or more persons formed for the purpose of committing, by their joint efforts, some unlawful ... act." If a conspiracy is conceived and executed and a private injury results, the person injured has a cause of action against all of the conspirators. Economy Carpets Manufacturers and Distributors, Inc. v. Better Business Bureau of Baton Rouge, Inc., 333 So.2d 765, 768 (La.App. 1st Cir.), writ denied, 334 So.2d 428 (La.1976).
In Tabb v. Norred, 277 So.2d at 228, the plaintiff, a deputy sheriff, responded to a call in which the caller advised that he had heard glass breaking at a neighborhood school and had seen lights in the school. Plaintiff went to the school to investigate and located defendant Vincent, who was armed with a pistol, inside the building. Plaintiff then entered the building where he was shot by defendant Norred, who was also armed. On appeal, in affirming the trial court determination of the liability of Vincent, the court noted that Vincent entered into a conspiracy with Norred to commit an unlawful act and that Vincent actively participated in the commission of that offense. The appellate court noted that the parties contemplated the possible necessity of shooting someone to avoid apprehension, which constituted a part of the conspiracy. Accordingly, the court determined that Vincent, as a co-conspirator, was liable with Norred for plaintiff's injuries, even though Norred actually fired the shot.
In National Union Fire Insurance Company of Pennsylvania v. Spillars, 552 So.2d at 634, the shop foreman with a distribution company allegedly purchased tractor-trailer parts from a vendor, which invoiced the distribution company for the parts. Payments on various invoices had been made by the distribution company, but no parts had been delivered. The payments had been applied to the shop foreman's personal account with the vendor. The insurance company, which had paid under its policy for the embezzlement, filed suit against the shop foreman and the vendor. The trial court determined that the shop foreman and the vendor engaged in a scheme to charge the distributing company for parts that were not delivered. In affirming a trial court judgment in favor of the insurance company and against the vendor, the appellate court determined that the record supported the trial court determination that the vendor had knowledge or should have had knowledge of the fraudulent scheme.
In Guidry v. Bank of LaPlace, 661 So.2d at 1058, defendant Martin operated a pyramid scheme under the guise of a travel business. Martin convinced his victims to provide him with funds to purchase large blocks of airline tickets for groups taking gambling trips to Las Vegas. Martin told his victims that certain Las Vegas hotels would reimburse him for the tickets and pay him a commission. In return for a check, Martin gave each victim two post-dated checks, representing the victim's original investment and a 60% annual return on the investment. The airline tickets and arrangements were fictitious however, and Martin kept his scheme alive by obtaining funds from later victims to honor the checks given to earlier victims. Over a twenty-month period, the plaintiff, Guidry, engaged in approximately 331 transactions with Martin, representing a total of more than $170,000,000. When Martin's scheme collapsed, Guidry was left with a net loss of approximately $5,500,000. Guidry filed suit against defendant, the Bank of LaPlace, where Martin kept the bank account through which he administered the scheme. The jury determined that the Bank of LaPlace was liable to Guidry. On appeal, the court reversed the judgment against the Bank of LaPlace, finding that there was no evidence of the requisite agreement between the bank and Martin necessary to find a conspiracy, citing State v. Kihnel, 488 So.2d *131 1238, 1240 (La.App. 4th Cir.), writ denied, 494 So.2d 1174 (La.1986).[8]
Although limited, the jurisprudence interpreting LSA-C.C. art. 2324 clearly requires an agreement (a meeting of the minds) or collusion between the parties for the purpose of committing wrongdoing. Evidence of such a conspiracy can be actual knowledge, overt actions with another, such as arming oneself in anticipation of apprehension, or inferred from the knowledge of the alleged co-conspirator of the impropriety of the actions taken by the other co-conspirator.

C. Application of law to facts.
In the instant case, the evidence relative to the alleged conspiracy of C & S with Dillard, Rhodus, and/or Lambert consisted of the testimony of Matthew Taylor, Wendell Keith Rhodus, Monte Lambert, and Ann and Sirman Dillard.
In 1990, Matthew S. Taylor was an assistant manager in the recovery department at C & S in Atlanta, Georgia. Stephens was delinquent in his payments to C & S, and the debt had been charged off because the bank was unable to locate Stephens. Taylor acknowledged, however, that, if he had been aware of Stephens' whereabouts prior to May, 1990, he would have obtained a writ of possession to retrieve the vehicle.
Taylor testified that, in May of 1990, he was contacted by Wendell Keith Rhodus, a bounty hunter who had located Leonard Stephens in Louisiana. From the context of Taylor's conversation with Rhodus, Taylor surmised that Rhodus had been contacted by Sirman Dillard, another bounty hunter. Dillard had performed a DMV (Department of Motor Vehicles) check and determined that C & S had a security interest in a pick-up truck owned by Leonard Stephens. Taylor explained that Rhodus was interested in securing Stephens on a bail bond and that Rhodus inquired as to whether C & S was interested in recovering the pick-up truck from Stephens as a secondary issue.
Taylor testified that he was aware that Louisiana was a "give up" state, which requires that the debtor voluntarily surrender the vehicle or that a writ of possession issue prior to effecting a repossession. Taylor indicated that, if Rhodus located Stephens and Stephens voluntarily surrendered the pick-up truck or if Rhodus obtained a writ of possession, C & S was interested in obtaining the truck. Taylor provided Rhodus with documentation relative to the bank's security interest in the truck to properly identify the vehicle.[9] According to Taylor, he had no further communications with Rhodus. Further, Taylor denied speaking with Rhodus prior to May, 1990, or telling Rhodus to do "whatever was necessary" to obtain the truck.
Taylor also denied entering into any agreement with Rhodus for the return of the truck, noting that C & S had not hired Rhodus. Nor had C & S negotiated any fee arrangement with Rhodus. The general fee paid for the return of a vehicle from out of state was mileage. Moreover, when C & S engaged an individual to repossess an automobile, the parties entered into a contract. Taylor noted that C & S did not send any correspondence to Rhodus to terminate its relationship with Rhodus because C & S had never engaged Rhodus to represent C & S.
Sirman Dillard testified, via deposition, that he and his wife, Ann, were engaged in the bail bond business in Tifton, Georgia. Ann Dillard bonded Leonard Stephens from jail. When Stephens did not appear, Sirman made arrangements to retrieve Stephens. Sirman testified that he learned of the whereabouts of Stephens by looking inside various vehicles parked at Stephens' sister's home in Georgia. In the bed of the truck, Sirman located documents which bore the name of C & S. Sirman then made inquiries *132 as to whether C & S had financed anything for Stephens, believing that Stephens may be making payments on anything he may have financed at C & S.
Sirman testified that he spoke with Doug Jones at C & S. Sirman advised Jones that there was an arrest warrant pending for Stephens and that he was looking for Stephens pursuant to that warrant. According to Sirman, Jones indicated that, if Stephens would release the truck, the bank would appreciate its return. However, if Stephens did not want to voluntarily release the truck, Sirman could provide C & S with Stephens' locations, and C & S would handle the matter itself.
Sirman came to Louisiana on one occasion to locate and return Stephens. According to Sirman, when he arrived in Livingston Parish, he contacted the sheriff's office, advising them that he had a bench warrant for Stephens. After the deputy reviewed Sirman's paperwork, he requested that Sirman return the following morning so that a deputy could accompany him to Stephens' home. The following morning, Sirman returned to the sheriff's office and presented his paperwork on Stephens. After communication between the Tifton sheriff's office and the Livingston Parish sheriff's office proved unsuccessful in obtaining the sheriff's assistance, Sirman contacted his attorney in Georgia. Sirman then returned to Georgia to attempt to resolve the matter in a different manner. According to Sirman, he did not return to Louisiana after that time.
Sirman Dillard denied that he was employed by C & S or that he had ever been paid anything by C & S. Sirman explained his contact with C & S as follows. The Tifton branch of C & S assisted him in locating Stephens. At that time, the bank indicated that, if Sirman located Stephens, perhaps he could get Stephens to bring the truck back to the bank in Georgia. When Sirman inquired about the truck to the Livingston Parish sheriff's office, he was advised that Sirman could not do that and that he would have to go through the legal process. Sirman said "[o]kay. I want to forget about this." Sirman made no attempts to remove the truck. Sirman testified that all of his efforts were directed at securing Stephens' person and not the truck.
When Sirman's attempt at returning Stephens to Georgia failed, he contacted Steve's Bail Bonds in New Orleans. Sirman's initial conversations were with Steve Ghergich. Later, Sirman spoke with Wendell Keith Rhodus of Bail Enforcement. Sirman engaged Rhodus to retrieve Stephens, but denied engaging Rhodus to secure the vehicle. Moreover, Rhodus had not been hired to beat Stephens or bring him back at any cost. Sirman explained that his interest in Stephens was his physical return because, if Stephens did not appear, the Dillards would be required to pay the bond.
Ann Dillard testified, via deposition, that she was not hired or employed by, nor did she act on behalf of, C & S. Ann testified that she had written the initial bail bond for Stephens. Ann stated that she received a telephone call from a person who indicated he was with C & S and that he had information relative to Stephens. Ann identified the caller as Doug Jones, who indicated that the truck had been repossessed. Jones advised Ann that he located Stephens' truck parked at a branch bank parking lot and discovered information relative to the whereabouts of Stephens in the bed of the truck. Other than this one incident, Ann denied having any other contact with C & S. Ann also denied that Jones requested that she retrieve a pick-up truck from Stephens. Ann acknowledged that her husband, Sirman, came to Louisiana to retrieve Stephens, but that he had not come to the state to retrieve the pick-up truck. Ann further testified that C & S did not pay her to obtain the pick-up truck from Stephens, nor did C & S promise her or her husband anything. Dillard unequivocally stated that her concern was the retrieval of Leonard Stephens and not the pick-up truck.
Ann explained that she knew Wendell Keith Rhodus and was aware that Rhodus was attempting to secure Stephens' person. Ann acknowledged that Rhodus made periodic calls to her and her husband to keep them advised of the progress of his capture of Leonard Stephens. In explaining Rhodus's compensation for his efforts, Ann explained that Rhodus had lost a pair of handcuffs in *133 attempting to secure Stephens and wanted to be paid for the property and that she had paid Rhodus for the handcuffs. However, Ann denied compensating Rhodus in any other manner. Rhodus subsequently captured Stephens and returned him to Sirman Dillard in Pensacola, Florida.
Monte D. Lambert testified that he worked for Bail Enforcement for approximately one week in April, 1990. Lambert testified that he did not have any communications with C & S. The only document Lambert saw which referred to C & S was a single sheet of paper received from Steve's Bail Bonds. The facsimile communication contained the name of the bank and a description of Stephens' vehicle. Lambert overheard Rhodus state that, if they could locate Stephens, they could repossess the truck because the bank "was giving the okay for it since he [Stephens] failed to make payments on the truck." According to Lambert, Rhodus also received information from a bonding company in Georgia. Rhodus told him that C & S and the Georgia bonding company were working together. Lambert testified that he had no direct knowledge of the communications between Rhodus and anyone else. The communication Rhodus had with others was by telephone and was simply recounted by Rhodus to Lambert. However, Lambert recalled a telephone conversation with the Dillards in which the Dillards asked if it would be a problem to obtain the truck and return it to the bank. Lambert testified that he responded that they would be glad to oblige. Lambert stated that he never saw anything from the bank authorizing Rhodus to beat Stephens or do anything with regard to the truck.
Lambert testified that, when Rhodus captured Stephens, Rhodus beat Stephens and asked about the whereabouts of the truck. Lambert recalled only one conversation with anyone after the capture of Stephens, which was to Sirman Dillard to advise him that Rhodus would bring Stephens to Georgia.
Wendell Keith Rhodus's deposition testimony reveals that, in 1990, he was an employee of Bail Enforcement. He also worked with Steve's Bail Bonds. Rhodus testified that he first heard the name of Leonard Stephens when he was associated with Steve's Bail Bonds. According to Rhodus, Sirman contacted Steve Ghergich regarding Stephens, and Ghergich contacted Rhodus on the matter. After being contacted, Rhodus contacted Sirman, who faxed information to him. Sirman engaged Rhodus to pick up Stephens and return Stephens to Georgia. Rhodus was to be paid the standard fees, namely ten percent of the bond, plus expenses. The bond on Stephens was $3,000.00. Upon engaging Rhodus, Sirman indicated Rhodus was to "get them back."
Rhodus testified that Sirman put him in touch with C & S with regard to the return of the pick-up truck. Rhodus testified that, in April, 1990, he spoke with several people at C & S, including perhaps Doug Jones whom Rhodus believed worked out of Atlanta. When he was contacted by C & S, the bank inquired as to the Louisiana procedures to obtain possession of the truck. Rhodus testified that C & S faxed him information on the truck and requested that Rhodus get the truck for them. Rhodus noted that the majority of the contact with C & S was during the first week and that C & S had provided him with copies of the loan documents. The pay arrangement discussed was a percentage of "whatever the account was." Rhodus testified that he was certain that he spoke with Matt Taylor about the matter also. C & S did not advise him of the manner in which he should proceed to obtain the truck, but indicated that they would like the vehicle returned. Rhodus admitted that, during the time he was in contact with the bank, he was committed to locating Stephens for the Dillards.
Rhodus recalled having a letter indicating that he had authority to repossess the truck and return it to Georgia. However, Rhodus acknowledged that the letter did not authorize him to do anything, but obtain the vehicle. The only persons interested in obtaining Stephens' person were Georgia bail bond people. C & S did not care whether Stephens remained in Louisiana or returned to Georgia; its interest was limited to the return of the truck. Rhodus explained that C & S did not say "go pick him up and arrest *134 him;" it was more a matter of "if you all find him, could you all get the truck?" No one at the bank instructed him to do physical harm to Stephens or to the Stephens family. Moreover, on the evening he captured Stephens, Rhodus was unable to locate the truck.
In the instant case, there is no evidence that Dillard, Rhodus, or Lambert were employees or servants of C & S. Dillard was employed by Georgia Bonding, and, at all pertinent times, Rhodus and Lambert were associated with Steve's Bail Bonds or Bail Enforcement. C & S did not have the right of control or supervision of these three individuals, nor did C & S have any of the other powers an employer or master has over its employees or servants. As such, C & S cannot be held liable for the tortious acts of non-servants.
Moreover, we find that there is no reasonable factual basis in the record to support the trial court's finding that C & S conspired with Dillard, Rhodus, or Lambert to perform an unlawful act and that the finding of liability as to C & S is manifestly erroneous. The evidence of C & S's involvement in the entire matter was limited to seeking the return of the pick-up truck if it would be voluntarily released by Stephens. There is no evidence that C & S entered into any agreement with or conceived any plan with Dillard, Rhodus, or Lambert to perform any unlawful act. C & S was interested in obtaining the return of the vehicle financed. Also, there is no evidence that C & S knew or was even aware of the tactics used by Dillard, Rhodus, or Lambert. As such, C & S cannot be liable as a civil co-conspirator for the actions of Dillard, Rhodus, or Lambert.
Because of our determination that C & S is not liable for the wrongful acts of Dillard, Rhodus, or Lambert or as a civil co-conspirator, we find it unnecessary to address the other issues raised in the appeal. Moreover, because of our determination on the issue of liability, the motion to remand filed by C & S is moot.

CONCLUSION
For the above reasons, the judgment of the trial court in favor of Mary Stephens, individually, and on behalf of the three minor children and against C & S is reversed. Costs of this appeal are assessed against Mary Stephens, individually and on behalf of the three minor children.
REVERSED.

ON REHEARING
PER CURIAM.
It has been called to our attention in an application for rehearing filed by Citizens and Southern National Bank (C & S) that we reversed the trial court judgment insofar as it rendered judgment in favor of Mary Stephens, individually and on behalf of the three minor children, and against C & S, and left, intact, the portion of the trial court judgment in favor of Leonard Stephens, on behalf of the three minor children. We intended to and now reverse that portion of the trial court judgment in favor of Leonard Stephens on behalf of the three minor children.
NOTES
[1] On April 27, 1992, judgment was rendered, dismissing and striking any and all claims for exemplary or punitive damages.
[2] By motion and order of partial dismissal, dated April 20, 1993, the Stephens dismissed their claims against Charters and Schmidt.
[3] The amount financed by C & S was $6,621.05, and C & S paid $6,140.00 to a Jacksonville, Florida bank which held a security interest in the truck.
[4] The judgment was signed on October 31, 1995.
[5] In this motion, C & S sought a reduction of its suspensive appeal bond to reflect the portion of the judgment in favor of Leonard Stephens, individually, which was compromised. By order, dated January 2, 1997, the motion was denied by this court.
[6] Via the motion to enlarge the pleadings, C & S sought to introduce evidence, which did not exist at the time of the trial of this matter, that Mary Alice and Leonard Stephens were never married and that only two of the three minor children on whose behalf pleadings were filed are the issue of Mary Alice and Leonard Stephens. By order, dated January 2, 1997, this court denied the motion.
[7] In Independent Fire Insurance Company v. Able Moving and Storage Company, Inc., 94-1982, p. 6 (La.2/20/95); 650 So.2d 750, 752, the Louisiana Supreme Court noted that the general rule stated in Rowell v. Carter Mobile Homes, Inc., 500 So.2d 748, 751 (La.1987), did not apply when third persons act to their detriment on the basis of an agent's apparent authority. Apparent authority is not an issue in the instant case; the limitation placed on the holding of Rowell v. Carter Mobile Homes, Inc., 500 So.2d at 751, by Independent Fire Insurance Company v. Able Moving and Storage Company, Inc., 650 So.2d at 752, is inapplicable in the instant case.
[8] State v. Kihnel, 488 So.2d 1238, 1240 (La.App. 4th Cir.1986), discussed the definition of conspiracy, quoting United States v. Rosenblatt, 554 F.2d 36, 38 (2nd Cir.1977), in which the court stated the following with regard to the bilateral formation of a conspiracy: "A conspiracy is an `agreement among the conspirators.' A `meeting of the minds' is required." (citations omitted.) (emphasis in original).
[9] Taylor provided Rhodus with copies of the consumer installment note, the security agreement, and the certificate of title.